The **NEW YORK TIMES COMPANY**, Plaintiff,

v.

Alberto **GONZALES**, in his official capacity as **Attorney General of the United States, and The United States of America**, Defendants.

No. 04 Civ. 7677(RWS).

United States District Court, S.D. New York.

Feb. 24, 2005.

As Amended Mar. 2, 2005.

Cahill Gordon & Reindel, New York, NY, By: Floyd Abrams, Susan Buckley, Brian Markley, for Plaintiff, of counsel.

George Freeman, The New York Times Company, Honorable Patrick J. Fitzgerald, United States Attorney for the Northern District of Illinois, Chicago, IL, By: Daniel W. Gillogly, James P. Fleissner, Debra Riggs Bonamici, Stuart D. Fullerton, Assistant United States Attorneys, for Defendant, of counsel.

## OPINION

SWEET, District Judge.

The defendants Alberto Gonzales ("Gonzales") in his official capacity as Attorney General of the United States[1] and the

1. Alberto Gonzales became the U.S. Attorney General on February 3, 2005, succeeding John Ashcroft, who had been named in the caption of this case as originally filed. Pursuant to Fed.R.Civ.P. 25(d)(1), Gonzales is automatically substituted as a defendant in this action. *See, e.g., Terry v. Ashcroft,* 336 F.3d

United States of America (collectively, the "government") have moved under Rule 12, Fed.R.Civ.P., to dismiss the complaint of The New York Times Company ("The Times") seeking a declaratory judgment concerning the confidentiality of telephone records for two of its reporters, which records are held by a third-party telephone company. The Times has moved for summary judgment under Rule 56, Fed.R.Civ.P., seeking certain of the relief sought in its complaint. The government has cross-moved for summary judgment dismissing the complaint. Upon the facts found to be undisputed and the conclusions of law set forth below, the government's motion to dismiss is denied, its cross-motion for summary judgment is granted in part and denied in part, and the motion of The Times is granted in part and denied in part.

***The Issues Presented***

These motions present competing considerations of the role of secrecy in our society. Secrecy may well be seen as the enemy of freedom when it conceals facts important to public understanding.[2] Yet here, both sides seek to enforce secrecy, albeit from dramatically different perspectives. The government, through a grand jury proceeding, seeks to investigate, and perhaps to prosecute, an alleged breach of a government secret, namely, the timing of the seizure of assets and Federal Bureau of Investigation ("FBI") searches of the offices of two Islamic charities in the fall of 2001. The Times, in opposing the govern-

ment's efforts, seeks to keep confidential the identity of the sources known to two of its reporters who wrote articles during the same period.

At issue is the proper relationship between two vitally important aspects of our democracy: the free press on the one hand and the fair and full administration of criminal justice on the other. Secrecy in government appears to be on the increase. *See, e.g.,* Pete Weitzel, *Freedom of Information: A Zeal for Secrecy,* The American Editor, May–June–July 2004, at 4; Bill Moyers, Journalism Under Fire, Address at the Society of Professional Journalists 2004 National Convention (Sept. 11, 2004), *available at* http://www.spj.org/moyers_spch.pdf (last visited Feb. 22, 2005).[3]

This development may well impact the ability of the press to report the news. *See, e.g.,* The Reporters Committee for Freedom of the Press, *Homefront Confidential: How the War on Terrorism Affects Access to Information and the Public's Right to Know* (5th ed.2004), *available at* http://www.rcfp.org/homefrontconfidential/ (last visited Feb. 22, 2005).

The free press has long performed an essential role in ensuring against abuses of governmental power. Indeed,

[T]he press serves and was designed to serve as a powerful antidote to any abuses of power by governmental officials and as a constitutionally chosen means for keeping officials elected by

128, 128 n. 1 (2d Cir.2003) (noting the automatic substitution of John Ashcroft for his predecessor, Janet Reno).

**2.** "Every thing secret degenerates, even the administration of justice; nothing is safe that does not show how it can bear discussion and publicity." John Emerich Edward Dalberg, Lord Acton, Letter of Jan. 23, 1861, *in Lord Acton and his Circle* 166 (Abbot Gasquet ed., 1906).

**3.** It has been reported that in 2001, the number of classified documents rose 18%, and since 2001, three new agencies were given the power to classify documents. *See* Adam Clymer, *Government Openness at Issue as Bush Holds on to Records,* N.Y. Times, Jan. 3, 2003, at A1.

the people responsible to all the people whom they were selected to serve. *Mills v. Alabama*, 384 U.S. 214, 219, 86 S.Ct. 1434, 16 L.Ed.2d 484 (1966) (observing that "[t]he Constitution specifically selected the press, which includes not only newspapers, books, and magazines, but also humble leaflets and circulars, to play an important role in the discussion of public affairs") (internal citation omitted). Informed public opinion, as our Supreme Court has recognized, "is the most potent of all restraints upon misgovernment. . . ." *Grosjean v. American Press Co.*, 297 U.S. 233, 250, 56 S.Ct. 444, 80 L.Ed. 660 (1936); *see also Cox Broadcasting Corp. v. Cohn*, 420 U.S. 469, 492, 95 S.Ct. 1029, 43 L.Ed.2d 328 (1975) ("Without the information provided by the press most of us and many of our representatives would be unable to vote intelligently or to register opinions on the administration of government generally."); *New York Times Co. v. United States*, 403 U.S. 713, 717, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971) (Black, J., concurring) ("In the First Amendment the Founding Fathers gave the free press the protection it must have to fulfill its essential role in our democracy. . . . The press was protected so that it could bare the secrets of government and inform the people.").

In order to gather information on sensitive topics, reporters, particularly those investigating stories that implicate our government and public officials, often depend upon confidential sources. In the words of Max Frankel, the former Executive Editor of The Times, offered some thirty years ago in connection with the *Pentagon Papers* case:[4]

In the field of foreign affairs, only rarely does our Government give full public information to the press for the direct purpose of simply informing the people. For the most part, the press obtains significant information bearing on foreign policy only because it has managed to make itself a party to confidential materials, and of value in transmitting those materials from government to other branches and offices of government as well as the public at large. This is why the press has been wisely and correctly called The Fourth Branch of Government.

(Affidavit of Judith Miller, sworn to Nov. 12, 2004 ("Miller Aff."), Ex. 8, at ¶ 7.)

■ Just as the ability of the press to report on issues of significance often depends on information obtained from others, so too is the ability of federal prosecutors to investigate and enforce the nation's criminal laws dependent upon the power of the federal prosecutor to obtain, at times through compulsion, testimony and evidence necessary to determine whether a crime has been committed. It is axiomatic that, in seeking such testimony and evidence, the prosecutor acts on behalf of the public and in furtherance of the "strong national interest in the effective enforcement of its criminal laws." *United States v. Davis*, 767 F.2d 1025, 1035 (2d Cir.1985) (citations omitted). Indeed, it is a fundamental and "ancient proposition of law," *United States v. Nixon*, 418 U.S. 683, 709, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974), that " 'the public . . . has a right to every man's evidence,' except for those persons protected by a constitutional, common-law, or statutory privilege." *Branzburg v. Hayes*,

---

4. In *New York Times Co. v. United States*, 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971) (per curiam), familiarly known as the *Pentagon Papers* case, the government sought to enjoin The Times and the Washington Post from publishing the contents of a classified study entitled "History of U.S. Decision–Making Process on Viet Nam Policy." The Supreme Court ruled that the government had not met its heavy burden to establish justification for such prior restraint. *See New York Times*, 403 U.S. at 714, 91 S.Ct. 2140.

408 U.S. 665, 688, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972) (citations omitted and alteration in original).

Here presented by the motions and cross-motion are the conflicting interests of the press and the federal criminal justice system—each institution, in turn, representing distinct interests of the public— under the particular circumstances presented by the parties to this litigation.

By this action, The Times seeks a declaratory judgment that the telephone records of two reporters employed by The Times, Judith Miller ("Miller") and Philip Shenon ("Shenon"), relating to time periods of twenty-three and eighteen days, respectively, during the months following September 11, 2001, are protected against compelled disclosure by the First Amendment to the U.S. Constitution, federal common law and the guidelines of the U.S. Department of Justice ("DOJ") set forth in 28 C.F.R. § 50.10 (the "Guidelines").[5]

The telephone records at issue, held by an unidentified third-party telephone company or companies, are being sought by the government as part of an investigation to uncover the identity of one or more government employees who purportedly "leaked" information to Miller and Shenon relating to the government's plans to block the assets and search the offices of two Islamic charity organizations in the fall of 2001. According to The Times, the disclosure of the telephone records at issue would not only constitute an unacceptable violation of the privacy of both Miller and Shenon but would also likely reveal the identities of dozens of confidential sources who are of no relevance to the government's investigation. It is the position of The Times that reporters are afforded both constitutional and common law protections with respect to the preservation of the identity of confidential sources, and that, under the circumstances of this case, the government has failed to establish that these protections are outweighed by the interest in effective law enforcement.

It is the government's position that the relief sought by The Times is both unwarranted and inappropriate, as the grant of such relief would permit a federal district court of the Southern District of New York to interfere with and potentially enjoin an investigation currently being conducted by a federal grand jury in the Northern District of Illinois, thereby encroaching on the authority of the Chief Judge of that district. The government further argues that the reporter's privilege invoked by The Times does not protect the telephone records in question and, even if it did, is outweighed by the public's interests in law enforcement, the fair administration of criminal law, and the prevention of misconduct by government agents.

The statement of these issues establishes the sensitive and difficult nature of the task presented to the Court.

### Prior Proceedings [6]

This action was initiated on September 29, 2004 by the filing of a complaint by The Times seeking a declaratory judgment and alleging four causes of action. Count I alleges a violation of the First and Fifth Amendments of the U.S. Constitution by

---

**5.** The Times has also sought a permanent injunction to enforce the terms of any declaratory judgment entered, although The Times is not pressing its request for injunctive relief in connection with the motions and cross-motion addressed herein.

**6.** In an unrelated case, Miller and other journalists have attempted to quash grand jury subpoenas issued in connection with an investigation into whether government employees had violated federal law by disclosing the identity of Central Intelligence Agency official Valerie Plame. See In re Grand Jury Subpoena, Judith Miller, 397 F.3d 964, 976–77 (D.C.Cir.2005).

virtue of the government's efforts to obtain and review the telephone records at issue without affording The Times an opportunity to be heard before a court of law. Counts II and III allege that the telephone records at issue are protected from disclosure under the First Amendment and by virtue of the reporter's privilege under federal common law, respectively. Count IV alleges that the government has not complied with the Guidelines.

The parties subsequently agreed to maintain the status quo with respect to the records sought and agreed to a briefing schedule. On October 14, 2004, the government moved under Rule 12, Fed. R. Civ. P., to dismiss the complaint. On November 12, 2004, pursuant to Rule 56, Fed.R.Civ.P., The Times moved for summary judgment on Counts II, III and IV. On January 3, 2005, pursuant to Rule 56, Fed.R.Civ.P., the government cross-moved for summary judgment to dismiss the same claims. The parties argued all three motions on January 19, 2005, and the motions were marked fully submitted at that time.

*Facts*

The following facts are drawn from The Times' Local Civil Rule 56.1 Statements, the government's Local Civil Rule 56.1 Statement, and the supporting affidavits and affirmations submitted by the parties.

Miller has been an investigative reporter for The Times since 1977, serving as a bureau chief, editor, and special correspondent, and she has authored four books (including *Germs,* an analysis of the threat posed by germ warfare that was published in September, 2001). She shared a Pulitzer Prize for a series of articles concerning international terrorism including Al Qaeda published in *The New York Times* in January 2001. She has written for The Times on national security, terrorism, the Middle East, and weapons of mass destruction.

Shenon has been a correspondent for The Times since 1981. He began his career at The Times as an assistant in the Washington bureau, and he subsequently served as a correspondent in Iran, Kuwait, Iraq, and Thailand. He then returned to The Times' Washington bureau. Shenon has been nominated for a Pulitzer Prize. He has written for The Times on homeland security, terrorism, the work of the National Commission on Terrorist Attacks Upon the United States (commonly known as the 9–11 Commission), the organization of intelligence agencies, and the prosecution of Zacarias Moussaoui, an alleged co-conspirator in the attacks of September 11, 2001.

Miller and Shenon have utilized confidential sources consistently in their work, and both have testified that confidential sources are essential in their reporting. (Miller Aff. ¶ 17; Affidavit of Philip Shenon, sworn to Nov. 9, 2004 ("Shenon Aff."), at ¶ 12.)

Miller and The Times have reported on terrorism and the involvement of Islamic charities since 1993. *See, e.g.,* Judith Miller, *Israel Says that a Prisoner's Tale Links Arabs in U.S. to Terrorism,* N.Y. Times, Feb. 17, 1993, at A1.

On February 19, 2000, *The New York Times* published an article written by Miller that stated that the U.S. government was investigating more than thirty Islamic charities suspected of having ties with terrorist organizations. *See* Judith Miller, *Some Charities Suspected of Terrorist Role,* N.Y. Times, Feb. 19, 2000, at A5. According to the article, targets of this investigation included two U.S. entities: the Global Relief Foundation, Inc. ("GRF"), located in Bridgeview, Illinois, and the Holy Land Foundation for Relief and Development ("HLF"), located in Richardson, Texas. *See id.*

The October 1, 2001 edition of *The New York Times* carried an article co-authored by Miller stating that "administration officials" were recommending that GRF be added to a list of Islamic charities and organizations whose assets would be frozen because they were "suspected of providing money and support to [Osama bin Laden's] terrorist operations." Judith Miller & Kurt Eichenwald, *A Nation Challenged: The Investigation; U.S. Set To Widen Financial Assault*, N.Y. Times, Oct. 1, 2001, at A1. This article relied on information provided to Miller by confidential sources.

On November 4, 2001, *The Los Angeles Times* carried a front-page article reporting that federal authorities were "intensifying their scrutiny of Islamic American nonprofits," including GRF and HLF, "as possible sources of funding for Al Qaeda and other terrorist organizations," and that the Treasury Department was seeking financial records related to GRF, HLF and other charities. Lisa Getter *et al.*, *Response To Terror; Sunday Report; Islamic American Nonprofits Face Increased Scrutiny in U.S.*, L.A. Times, Nov. 4, 2001, at A1. This article quoted an HLF director who claimed that he had been interviewed several weeks earlier by two FBI agents and that the agents communicated concerns that HLF was affiliated with terrorists. *See id.*

At some time prior to December 3, 2001, Miller received information from one or more confidential sources concerning the government's intent to freeze the assets of HLF. (Miller Aff. ¶ 9.)

On December 3, 2001, consistent with The Times' policy of seeking comment from the subjects of its articles, Miller telephoned HLF and spoke with HLF representatives about the information that had been disclosed to her by one or more confidential sources. According to Miller, she sought comment from HLF at this time only "about the government's intent to block HLF's assets," and she did not intend to tip-off HLF about the impending FBI search of HLF's offices. (*Id.* ¶ 10–11.) Patrick J. Fitzgerald, U.S. Attorney for the Northern District of Illinois ("Fitzgerald"), representing the government, has stated that on the night of December 3, 2001, Miller disclosed to HLF personnel that "government action was imminent" (Affirmation of Patrick J. Fitzgerald, dated Nov. 19, 2004 ("Fitzgerald Aff."), at ¶ 3), and that the HLF personnel were surprised by the information conveyed by Miller. (*Id.* ¶ 5). According to Miller, "[t]hat government action was taken against [HLF] did not come as a surprise to even a casual observer." (Miller Aff. ¶ 5.)

On December 4, 2001, *The New York Times* carried an article written by Miller that revealed that President Bush planned to announce that the federal government was freezing HLF's assets. *See* Judith Miller, *U.S. To Block Assets It Says Help Finance Hamas Killers*, N.Y. Times, Dec. 4, 2000, at A1. This article was available on The Times' website on the evening of December 3 and in the early editions of the December 4 newspaper, which were available at newsstands late in the evening on December 3.

On December 4, 2001, FBI agents searched HLF's offices. According to Fitzgerald, the disclosure by Miller to HLF on December 3 had the effect of creating increased safety risks to the FBI agents conducting the search and of increasing the likelihood of destruction or concealment of evidence or assets. (Fitzgerald Aff. ¶ 3.) According to The Times, the government has provided no facts to support its assertion that the HLF search was so compromised.

At some point prior to December 13, 2001, Shenon received information concerning the government's intent to freeze

the assets of GRF. (Shenon Aff. ¶ 5.) This information came from one or more confidential sources. (*Id.*)

Consistent with The Times' policy of seeking comment from the subjects of its articles, on December 13, 2001, Shenon contacted a GRF representative about the information received from the confidential sources. The GRF representative referred Shenon to a GRF attorney with whom Shenon subsequently spoke. According to Shenon, he contacted GRF "for the purpose of seeking comment on the government's apparent intent to freeze its assets." (*Id.* ¶ 7.) According to the government, Shenon disclosed to the GRF representatives that "government action was imminent." (Fitzgerald Aff. ¶ 3).

Fitzgerald has noted that *The Washington Post* reported that GRF representatives were surprised by Shenon's disclosure to them. (*Id.* ¶ 5 (quoting Susan Schmidt, *Reporters' Files Subpoenaed; New Leak Probe Concerns 2001 Raid on Islamic Charity,* Wash. Post, Sept. 10, 2004, at A16).) Shenon has stated that in light of prior news reports and prior government actions, the GRF raid was not a surprise. (Shenon Aff. ¶ 8.)

On December 14, 2001, FBI agents searched GRF's offices. According to Fitzgerald, Shenon's December 13 communication with GRF representatives put at risk the FBI agents who conducted the search and increased the likelihood that evidence and assets would be destroyed or concealed. (Fitzgerald Aff. ¶ 3.) According to The Times, the government has failed to come forward with any evidence that the investigation was compromised or that the FBI agents were endangered.

At some point after December 14, 2001, the U.S. Attorney's Office for the Northern District of Illinois and the FBI Chicago Field Office commenced an investigation to determine whether government officials were responsible for disclosing to The Times that a search of GRF's offices was imminent.

By letter dated August 7, 2002, Fitzgerald requested that The Times cooperate with the GRF investigation. To this end, Fitzgerald requested a voluntary interview with Shenon and voluntary production of the telephone records for Shenon for September 24 to October 2, 2001 and December 7 to December 15, 2001.

By letter dated August 13, 2002, George Freeman ("Freeman"), Assistant General Counsel of The Times, responded to Fitzgerald's August 7 letter. Freeman stated that The Times had considered Fitzgerald's request but could not comply because Shenon's newsgathering activities, and, in particular, his conversations with confidential sources, were protected by the First Amendment, federal common law, applicable state law, and the Guidelines. The parties had no further communication until the summer of 2004.

By letter dated July 12, 2004, Fitzgerald informed The Times that his investigation had been expanded to include the alleged leak to Miller concerning the government's plans to freeze HLF's assets. Fitzgerald reiterated his previous request for a voluntary interview with Shenon and for voluntary production of the previously requested telephone records. Furthermore, he requested a voluntary interview with Miller and voluntary production of her telephone records for the following three time periods in 2001: September 24 to October 2, November 30 to December 4, and December 7 to December 15. Finally, pursuant to the Guidelines, Fitzgerald disclosed that he had been "duly authorized to obtain and review information from other sources, particularly those entities providing telephone service to *The New York Times,* Ms. Miller and Mr. Shenon." (Affidavit of Floyd Abrams, sworn to Nov. 12, 2004 ("Abrams Aff."), Ex. 3, at 2.) Fitzgerald warned that he intended to exercise

this authority to obtain the telephone records "in very short order" if The Times refused to cooperate with the investigation. (*Id.*)

After The Times received Fitzgerald's July 12 letter, Freeman and Floyd Abrams ("Abrams"), outside counsel to The Times, contacted The Times' telephone service providers. Freeman and Abrams requested that these providers notify The Times upon the receipt of any government subpoena for the telephone records of Miller and Shenon and that they not turn over such records to the government without first providing The Times an opportunity to mount a legal challenge to the compelled disclosure of such records. The telephone service providers responded that they would not undertake to inform The Times of any such subpoenas.

By letter of July 21, 2004, Freeman responded to Fitzgerald's July 12 letter. Freeman stated that pursuant to the Guidelines and relevant case law, Fitzgerald had an obligation to exhaust all potential alternative sources for the sought information before resorting to compulsory process. Freeman stated that Fitzgerald's letters had failed to indicate what steps, if any, Fitzgerald had taken to satisfy this obligation. Freeman's letter stated:

> We are especially concerned about your request regarding the phone records of two of our reporters. Obviously, were you to obtain such records, they would implicate not only the sources you claim exist with respect to the leaks you apparently are investigating, but, far more broadly, all of the sources that journalists Shenon and Miller had during [the] months indicated. This truly would be a fishing expedition well beyond any permissible bounds and would be a very serious violation of rights clearly protected by the First Amendment: with respect to all of their sources other than those implicated by your investigation,

no showing would have been made by the government regarding the need to obtain those phone numbers and sources.

(*Id.* Ex. 4, at 2.) Freeman stated that if the dispute over the telephone records for Miller and Shenon could not be otherwise resolved, The Times planned to litigate the issue. Freeman requested that subpoenas not be served on The Times' telephone providers or other third parties until The Times was provided an opportunity, if necessary, to put the issue before a court.

By letter dated July 27, 2004, Fitzgerald responded to Freeman's July 21 letter. Fitzgerald stated that pursuant to the Guidelines, The Times was not entitled to know what steps had previously been taken with respect to the investigation at issue. Fitzgerald stated: "We do not intend to engage in debate by letter. We will not delay further and will proceed." (*Id.* Ex. 5, at 1.) Nonetheless, Fitzgerald invited Freeman to speak with him concerning The Times' cooperation with the investigation.

After The Times received Fitzgerald's July 27 letter, Abrams spoke with Fitzgerald by telephone. During the course of this conversation, Abrams asked Fitzgerald whether The Times' telephone records were being sought in connection with a grand jury investigation and whether the telephone records had already been obtained. Fitzgerald declined to answer either question. However, Fitzgerald agreed to give Abrams a period of time to familiarize himself with the situation, and that, in the interim, the government would not seek to obtain any of The Times' telephone records that it had not already obtained and that it would not review any such previously-obtained records.

By letter dated August 4, 2004, Abrams and Kenneth W. Starr ("Starr"), outside counsel to The Times, requested that Deputy U.S. Attorney General James Comey

("Comey") grant The Times a meeting to discuss Fitzgerald's efforts to obtain the telephone records for Miller and Shenon. Abrams and Starr stated that the telephone records at issue reflected hundreds of communications between Miller, Shenon and their respective confidential sources at a time when both reporters were investigating and reporting on an array of important and controversial issues. Abrams and Starr asserted that discovery of the telephone records could lead to the disclosure of potentially dozens of confidential sources without permitting The Times an opportunity to attempt to persuade a court that the records are protected. Finally, Abrams and Starr requested that the government not seek the telephone records at all or, in the alternative, agree to do so in a way that would afford The Times and its reporters the opportunity to assert that the records are protected.

Fitzgerald and Abrams spoke after the August 4 letter was delivered to Comey. According to Abrams, Fitzgerald at that time agreed that, pending a response from Comey, the government would continue to abide by his previous representations. (Abrams Aff. ¶ 12.)

By letter dated September 23, 2004, Comey declined The Times' request for a meeting. Comey concluded that Fitzgerald's conduct was proper in all respects:

> Your complaint that [DOJ] failed to articulate a "need" for the records at issue presumes that we have an obligation to share with the *New York Times* a summary of the investigation to date before we can conduct our investigation. We have no such obligation and, indeed, are bound by law not to share sensitive investigative information with the press. Nor do we have an obligation to afford the *New York Times* an opportunity to

challenge the obtaining of telephone records from a third party prior to our review of the records, especially in investigations in which the entity whose records are being subpoenaed chooses not to cooperate with the investigation.... Having diligently pursued all reasonable alternatives out of regard for First Amendment concerns, and having adhered scrupulously to [DOJ] policy, including a thorough review of Mr. Fitzgerald's request within [DOJ], we are now obliged to proceed.

(Abrams Aff. Ex. 7, at 1–2.)

The Times initiated the present legal action on September 29, 2004. By letter dated October 14, 2004, Abrams informed the Court that "[w]e have engaged in fruitful discussions with counsel for the Government and can report that the Government has agreed to forgo any action to obtain records or to review any records that may have already been obtained until such time as [the Court] has ruled on the planned motions...." (Letter from Abrams to the Court of Oct. 14, 2004, at 1.)

In its brief dated October 27, 2004, the government stated for the first time that in connection with the HLF and GRF leaks, a grand jury empaneled in the Northern District of Illinois is currently investigating violations of law, including obstruction of justice, by federal government officials in the fall of 2001.

During the relevant time period from which telephone records are sought, *The New York Times* published fifteen articles written by Shenon and Miller. Many of these articles included information and statements provided by confidential sources. During this time period, Shenon and Miller also investigated and gathered information for numerous other articles that were not published until weeks later.[7]

---

7. Between September 24 and December 31 of 2001, Shenon and Miller wrote seventy-eight

articles that were published in *The New York Times*. These articles contained information

(Miller Aff. ¶ 13; Shenon Aff. ¶ 11.) According to Miller and Shenon, the sought records will reveal hundreds of communications between Shenon and Miller and their confidential sources. (Miller Aff. ¶ 13; Shenon Aff. ¶ 11.)

Both Miller and Shenon have testified that the telephone records sought by the government will reveal communications with confidential sources that did not concern the HLF and GRF seizures (Miller Aff. ¶ 21; Shenon Aff. ¶ 15) as well as personal calls made by them. (Miller Aff. ¶ 12; Shenon Aff. ¶ 10.) Miller and Shenon have both testified that disclosure of their confidential sources in this case would likely undermine their ability to elicit information from confidential sources in the future. (Miller Aff. ¶ 21; Shenon Aff. ¶ 12.)

Russell Scott Armstrong ("Armstrong"), a professional journalist with experience reporting on national securities matters and an expert on the use of secret and classified documents in daily journalism, has stated:

Many sources require ... guarantees of confidentiality before any extensive exchange of information is permitted.... [E]ven in public institutions that are known for their transparency and openness, officials and staff often require such guarantees of confidentiality before discussing sensitive matters such as major policy debates, personnel matters, investigations of improprieties and financial and budget matters.... Many types of reporting require the use of confidential sources. Prominent among

these uses are ... investigative or "enterprise" journalism....

(Affidavit of Russell Scott Armstrong, sworn to Nov. 23, 2004 ("Armstrong Aff."), at ¶¶ 9–10.) According to Armstrong, the broad use of secrecy in government and among corporate and institutional entities creates a need for journalists to rely on confidential sources. (*Id.* ¶ 13.)

Jack Nelson, a former journalist with experience covering the administrations of U.S. presidents, has stated:

A reporter whose telephone records are turned over to prosecutors, thus potentially revealing dozens of confidential sources, would be greatly compromised in any future attempts to cover government. Other government sources who insist on confidentiality would have no reason to believe that the reporter could uphold such a promise and would refuse to cooperate. And it would undoubtedly have a ripple effect, silencing whistleblowers and other government employees who might otherwise cooperate with the press in exposing government wrongdoing.

(Affidavit of Jack Nelson, sworn to Nov. 23, 2004 ("Jack Nelson Aff."), at ¶ 6.) A Pulitzer Prize winner, Jack Nelson has catalogued a series of reports made possible through the use of confidential sources, including disclosures relating to Watergate, the pardon of President Nixon, allegedly improper activities of OMB Director Bert Lance and Billy Carter during the Carter presidency, Iran/Contra, and the Monica Lewinsky scandal. (Jack Nelson Aff. ¶ 5.)

---

from confidential sources on a range of issues including: (1) financing and support of Al Qaeda provided from sources in Pakistan, Saudi Arabia, and the United Arab Emirates; (2) cooperation between Al Qaeda and Pakistani intelligence prior to September 11, 2001; (3) the U.S. government's preparedness for the

attacks of September 11, 2001; (4) the U.S. government's efforts to combat Al Qaeda in Afghanistan; (5) the proposed internal reorganization of the FBI; (6) the existence of weapons of mass destruction in Iraq; (7) the spread of anthrax and resulting U.S. government investigations.

Jeffrey H. Smith ("Smith"), a lawyer with deep and varied experience in government, has testified by affidavit as to the function performed by government confidential sources:

> As a long-time government attorney handling national security matters, I know that federal agencies benefit from the ability to have official speak confidentially, although in an authorized manner, with the news media.... This permits the government to get information to the public without attribution to a named official or without publicly declaring the statement as official policy.

(Affidavit of Jeffrey H. Smith, sworn to Nov. 23, 2004 ("Smith Aff."), at ¶ 3.) Smith has stated that "[a]uthorized disclosures 'on background' are substantially different than unauthorized leaks." (*Id.* ¶ 4.) "Nonetheless some leaks may be in the public interest." (*Id.* ¶ 5.)

Anna Nelson, a historian whose scholarship focuses on United States foreign policy, has stated:

> Requiring journalists to reveal the identities of their sources, or obtaining the identity of those sources through telephone record subpoenas, would impoverish our knowledge of contemporary history since confidential sources are often the only sources available to the journalist and thus the original source for historians seeking to unravel public policy or foreign policy. A journalist's exposure of the My–Lai incident is just such an example. The journalist was able to keep his sources confidential and as a consequence, historians have deepened their view of the way in which the war in Vietnam was fought.... The sources used by journalists are also important to counter the deliberate leaks from the government that are designed to influence the public.

(Affidavit of Anna Nelson, sworn to Nov. 23, 2004 ("Anne Nelson Aff."), at ¶¶ 5–6.)

## Discussion

### I. The Standards to be Applied

#### A. The Rule 12(b) Standard

Rule 12(b), Fed.R.Civ.P., provides that a defendant may move to dismiss a complaint for "(1) lack of jurisdiction over the subject matter, (2) lack of jurisdiction over the person, (3) improper venue, (4) insufficiency of process, (5) insufficiency of service of process, (6) failure to state a claim upon which relief can be granted, [and] (7) failure to join a party under Rule 19." Fed.R.Civ.P. 12(b). Although the government has not specified which subsection of Rule 12 is being invoked in connection with its motion to dismiss the complaint, the grounds raised in the motion suggest that subsection (6) is the relevant provision.

■ In considering a motion to dismiss pursuant to Rule 12(b)(6), the Court construes the complaint liberally, "accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor," *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002) (citing *Gregory v. Daly,* 243 F.3d 687, 691 (2d Cir.2001)), although "mere conclusions of law or unwarranted deductions" need not be accepted. *First Nationwide Bank v. Gelt Funding Corp.,* 27 F.3d 763, 771 (2d Cir.1994) (quotation marks and citation omitted).

" '[T]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims.' " *York v. Ass'n of Bar of City of New York,* 286 F.3d 122, 125 (2d Cir.) (quoting *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974)), *cert. denied,* 537 U.S. 1089, 123 S.Ct. 702, 154 L.Ed.2d 633 (2002). In other words, " 'the office of a motion to dismiss is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be

offered in support thereof.'" *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of New York*, 375 F.3d 168, 176 (2d Cir.2004) (quoting *Geisler v. Petrocelli*, 616 F.2d 636, 639 (2d Cir.1980)). "[T]he court should not dismiss the complaint for failure to state a claim 'unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *Ricciuti v. New York City Transit Auth.*, 941 F.2d 119, 123 (2d Cir.1991) (quoting *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)); *accord Eternity Global Master Fund*, 375 F.3d at 176–77.

### B. *The Rule 56 Standard*

■ In considering a motion for summary judgment in an action for declaratory relief, courts apply the same standard under Rule 56, Fed.R.Civ.P., applicable to any other summary judgment motion. *See PDK Labs, Inc. v. Friedlander*, 103 F.3d 1105, 1111 (2d Cir.1997); *Roe v. City of New York*, 232 F.Supp.2d 240, 252 (S.D.N.Y.2002).

Pursuant to Rule 56, summary judgment may be granted only if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *SCS Communications, Inc. v. Herrick Co., Inc.*, 360 F.3d 329, 338 (2d Cir.2004). The court will not try issues of fact on a motion for summary judgment, but, rather, will determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Summary judgment is appropriate where the moving party has shown that "little or no evidence may be found in support of the nonmoving party's case. When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1223–24 (2d Cir.1994) (internal citations omitted). If, however, "'as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper.'" *Security Ins. Co. of Hartford v. Old Dominion Freight Line Inc.*, 391 F.3d 77, 83 (2d Cir.2004) (quoting *Gummo v. Village of Depew*, 75 F.3d 98, 107 (2d Cir.1996)).

"The party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists and that the undisputed facts establish her right to judgment as a matter of law." *Rodriguez v. City of New York*, 72 F.3d 1051, 1060–61 (2d Cir.1995) (citation omitted). This burden may be satisfied "by showing—that is pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *PepsiCo, Inc. v. Coca–Cola Co.*, 315 F.3d 101, 105 (2d Cir.2002) (per curiam) (internal quotation marks and citations omitted); *accord Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir.1995).

In order to defeat a motion for summary judgment, the non-moving party must offer sufficient evidence to enable a reasonable jury to return a verdict in its favor. *See Anderson*, 477 U.S. at 248, 106 S.Ct. 2505; *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 101 (2d Cir.2001); *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir.1998). In other words, the non-moving party "may not rely simply on conclusory statements or on contentions that the affi-

davits supporting the motion are not credible." *Ying Jing Gan v. City of New York,* 996 F.2d 522, 532 (2d Cir.1993); *accord Scotto,* 143 F.3d at 114–15.

A material fact is one that would "affect the outcome of the suit under the governing law," and a dispute about a genuine issue of material fact occurs if the evidence is such that "a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505; *see also R.B. Ventures, Ltd. v. Shane,* 112 F.3d 54, 57 (2d Cir.1997). Thus, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505; *see also Quarles v. Gen. Motors Corp.,* 758 F.2d 839, 840 (2d Cir.1985) (per curiam) ("[T]he mere existence of factual issues—where those issues are not material to the claims before the court—will not suffice to defeat a motion for summary judgment."). In determining whether a genuine issue of material fact exists, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Gibbs–Alfano v. Burton,* 281 F.3d 12, 18 (2d Cir.2002).

## II. *The Motion to Dismiss Under Rule 12(b) Is Denied*

Given the government's theory of dismissal, *i.e.,* that the court should decline to exercise its discretion to declare the rights of the litigants, it is assumed that the government is proceeding pursuant to Rule 12(b)(6), Fed.R.Civ.P. *See, e.g., Alpine Group, Inc. v. Johnson,* No. 01 Civ. 5532(NRB), 2002 WL 10495, at *4 (S.D.N.Y. Jan.3, 2002) (dismissing declaratory judgment claim on discretionary grounds pursuant to Rule 12(b)(6)); *Gianni Sport Ltd. v. Metallica,* No. 00 Civ. 0937(MBM), 2000 WL 1773511, at *6 (S.D.N.Y. Dec.4, 2000) (same); *Wilkinson v. Caronia Corp.,* No. 95 Civ. 5668(JSM), 1995 WL 653374, at *1 (S.D.N.Y. Nov.7, 1995) (same).

For the reasons set forth below, the government's motion is denied.

## A. *The Requirements Of The Declaratory Judgment Act*

The Declaratory Judgment Act provides in pertinent part that:

> In a case of actual controversy within its jurisdiction ... any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

28 U.S.C. § 2201(a). The policy "animating the Declaratory Judgment Act ... is to enable parties to adjudicate their disputes before either suffers great damage." *Starter Corp. v. Converse, Inc.,* 84 F.3d 592, 596 (2d Cir.1996) (citing *In re Combustion Equipment Assocs.,* 838 F.2d 35, 37 (2d Cir.1988)).

■ Not every dispute may be adjudicated in the federal courts as a declaratory judgment action. First, a basis for subject matter jurisdiction must exist apart from the Declaratory Judgment Act itself, as section 2201 "provides no independent basis for subject matter jurisdiction." *Niagara Mohawk Power Corp. v. Tonawanda Band of Seneca Indians,* 94 F.3d 747, 752 (2d Cir.1996) (citing *Albradco, Inc. v. Bevona,* 982 F.2d 82, 85 (2d Cir.1992)); *accord Starter,* 84 F.3d at 594.[8] Second, the

---

**8.** Subject matter jurisdiction for purposes of a declaratory judgment action may be asserted under 28 U.S.C. § 1331, *see, e.g., Starter,* 84

Declaratory Judgment Act "permits declaratory relief only in cases presenting 'actual controvers[ies],' 28 U.S.C. § 2201(a), a requirement that incorporates into the statute the case or controversy limitation on federal jurisdiction found in Article III of the Constitution." *Niagara Mohawk Power*, 94 F.3d at 752 (alteration in original) (citing *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 239–40, 57 S.Ct. 461, 81 L.Ed. 617 (1937)).

There is "no bright line rule for determining 'whether the dispute presents a substantial controversy or merely an abstract question'.... Instead, courts must decide whether a justiciable controversy exists 'on a case by case basis.'" *American Pioneer Tours, Inc. v. Suntrek Tours, Ltd.*, No. 97 Civ. 6220(DLC), 1998 WL 60944, at *2 (S.D.N.Y. Feb.13, 1998) (citing *Kidder, Peabody & Co. v. Maxus Energy Corp.*, 925 F.2d 556, 562 (2d Cir.1991)). As the Supreme Court explained in *Maryland Casualty Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 61 S.Ct. 510, 85 L.Ed. 826 (1941),

> The difference between an abstract question and a "controversy" contemplated by the Declaratory Judgment Act is necessarily one of degree, and it would be difficult, if it would be possible, to fashion a precise test for determining in every case whether there is such a controversy. Basically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

*Maryland Cas.*, 312 U.S. at 273, 61 S.Ct. 510. Thus, a declaratory judgment action "presents an actual controversy if 'the facts alleged, under all the circumstances, show that there is a substantial controver-

sy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.'" *In re Prudential Lines Inc.*, 158 F.3d 65, 70 (2d Cir.1998) (quoting *Maryland Cas.*, 312 U.S. at 273, 61 S.Ct. 510); *accord Starter*, 84 F.3d at 594–95; *Olin Corp. v. Consol. Aluminum Corp.*, 5 F.3d 10, 17 (2d Cir.1993).

Where it appears that "the contingent event upon which the controversy rests is unlikely to occur, the controversy lacks 'sufficient immediacy and reality' to warrant declaratory relief." *In re Prudential Lines*, 158 F.3d at 70 (citing *Certain Underwriters at Lloyd's v. St. Joe Minerals Corp.*, 90 F.3d 671, 675 (2d Cir.1996) (observing that, "in the absence of an 'actual controversy,' a district court is without power to grant declaratory relief") (citation omitted)). Similarly,

> [t]he disagreement must not be nebulous or contingent but must have taken on fixed and final shape so that a court can see what legal issues it is deciding, what effect its decision will have on the adversaries, and some useful purpose to be achieved in deciding them.

*Jenkins v. United States*, 386 F.3d 415, 417–418 (2d Cir.2004) (quoting *Public Serv. Comm'n of Utah v. Wycoff Co., Inc.*, 344 U.S. 237, 244, 73 S.Ct. 236, 97 L.Ed. 291 (1952)) (quotation marks omitted); *see also Certain Underwriters at Lloyd's*, 90 F.3d at 675 (observing that "[i]t is by now traditional law that '[t]he judicial power does not extend to ... abstract questions'") (quoting *Wycoff*, 344 U.S. at 242, 73 S.Ct. 236 (internal quotation marks and citation omitted)). "Where the relief sought 'would not resolve the entire case or controversy as to any [party] ..., but would merely determine a collateral legal issue governing certain aspects of ...

F.3d at 594–95, or under 28 U.S.C. § 1332. *See, e.g., Correspondent Servs. Corp. v. First*

*Equities Corp. of Florida*, 338 F.3d 119, 125–26 (2d Cir.2003).

pending or future suits,' " a subject of the declaratory judgment action does not qualify as a controversy under Article III. *Jenkins*, 386 F.3d at 418 (quoting *Calderon v. Ashmus*, 523 U.S. 740, 747, 118 S.Ct. 1694, 140 L.Ed.2d 970 (1998)). "Whether a real and immediate controversy exists in a particular case is a matter of degree and must be determined on a case-by-case basis." *Kidder, Peabody*, 925 F.2d at 562.

### B. *The Times Has Alleged An Actual Controversy*

The government has not challenged the existence of subject matter jurisdiction over The Times' claims pursuant to 28 U.S.C. § 1331 and § 1346(a)(2). Nor has the government raised any argument as to the propriety ·of venue pursuant to 28 U.S.C. § 1391.

■ With respect to the Article III case or controversy requirement, the government has acknowledged that The Times has standing to assert its claim to a "legally cognizable [First Amendment] interest in the materials or information sought" by the government subpoena.[9] (Gov. Mem. Supp. Mot. Dismiss at 8–9.) It is well established that "[a] privilege may be invoked by a news gathering agency, in addition to a person engaging in news gathering dissemination." *In re Williams*, 766 F.Supp. 358, 369 n. 12 (W.D.Pa.1991) (citing *United States v. Cuthbertson*, 630 F.2d 139 (3d Cir.1980) (stating that a television network holds a privilege protecting against the disclosure of information gathered by its news reporters)), *aff'd by an equally divided en banc court*, 963 F.2d 567 (3d Cir.1992); *Gulliver's Periodicals v. Chas. Levy Circulating Co., Inc.*, 455 F.Supp. 1197 (N.D.Ill.1978) (stating that "[a] publisher and [its] reporters are protected by the [F]irst [A]mendment . . .

from revealing the sources and source material on which they relied in writing and publishing [an] article").

■ However, the government contends that the facts alleged, which it characterizes as concerning "hypothetical subpoenas issued in hypothetical circumstances[,]" (Gov. Mem. Supp. Mot. Dismiss at 7–8 n. 5), present merely a hypothetical question and no actual dispute. To the contrary, it is alleged that: (1) subpoenas have been threatened (Compl. ¶¶ 25 (quoting Letter of Fitzgerald to Watson of July 12, 2004, at 2), 28 & 30); (2) the Deputy Attorney General has stated that the Department is "obliged to proceed" (Compl. ¶ 30 (quoting Letter from Comey to Abrams of Sept. 23, 2004, at 2)); and (3) the government has previously rejected requests by The Times for details concerning when such subpoenas will issue. (Compl.¶ 3).

Based on these allegations, The Times has properly stated: (1) that there is a substantial controversy, (2) that the parties have adverse legal interests, and (3) that the controversy has sufficient immediacy and reality. *See In re Prudential Lines*, 158 F.3d at 70. Therefore, declaratory relief is appropriate to allow the resolution of this dispute before it has "ripened to a point at which an affirmative remedy is needed." *See* 10B Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice & Procedure: Civil 3d* § 2751, at 455 (1998).

Because this dispute involves First Amendment rights, the existence of a case and controversy is that much more apparent. *See City of Houston v. Hill*, 482 U.S. 451, 459 n. 7, 107 S.Ct. 2502, 96 L.Ed.2d 398 (1987) (stating that the plaintiff had standing to seek declaratory and injunctive

---

9. As discussed in greater detail below, *see* discussion *infra* Part III, the Guidelines acknowledge that First Amendment interests are

implicated when a subpoena is issued for the telephone records of a member of the news media. *See* 28 C.F.R. § 50.10.

relief where a "genuine threat" existed that he would be prosecuted under an overbroad statute) (citation omitted); *Steffel v. Thompson*, 415 U.S. 452, 458–59, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974) (stating that the petitioner presented an "actual controversy" within the meaning of Article III and the Declaratory Judgment Act where the threat of prosecution for distributing handbills was not "imaginary or speculative"); *see also Carlin Communications, Inc. v. Smith*, No. 83 Civ. 9004(CBM), 1984 WL 330, at *6 (S.D.N.Y. May 8, 1984) (stating that "plaintiffs asserting the violation of First Amendment rights need not wait until they are subjected to criminal prosecution before challenging the statute in issue"). *Natco Theatres, Inc. v. Ratner*, 463 F.Supp. 1124, 1127 (S.D.N.Y.1979) (stating that the plaintiff had standing to challenge a licensing statute on First Amendment grounds despite the fact that it had not yet applied for a license).

Under these principles and authorities, a justiciable controversy has been presented.

## C. *The Discretionary Exercise of Jurisdiction*

The government has urged the Court to decline to entertain The Times' declaratory relief action on the following discretionary grounds: (1) that a motion to quash pursuant to Rule 17(c), Fed.R.Crim.P.,[10] is the more appropriate means of attacking a grand jury subpoena and (2) that this declaratory judgment action unreasonably encroaches on the authority of the District Court for the Northern District of Illinois, under whose auspices the subpoenas may issue.

The parties dispute the degree of discretion possessed by this Court in deciding whether to entertain a declaratory judg-

ment action. According to The Times, "a district court is required to entertain a declaratory judgment action '(1) when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, or (2) when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding.'" *Starter*, 84 F.3d at 597 (quoting *Continental Cas.*, 977 F.2d at 737).

The government contends that, pursuant to Supreme Court and Second Circuit cases decided after *Starter*, even where there is jurisdiction and an actual controversy, a district court retains discretion as to whether it will entertain a declaratory judgment action. The Supreme Court has explained:

> Since its inception, the Declaratory Judgment Act has been understood to confer on federal courts unique and substantial discretion in deciding whether to declare the rights of litigants. On its face, the statute provides that a court *"may* declare the rights and other legal relations of any interested party seeking such declaration," [28 U.S.C. § 2201(a) ].... The statute's textual commitment to discretion, and the breadth of leeway we have always understood it to suggest, distinguish the declaratory judgment context from other areas of the law in which concepts of discretion surface.

*Wilton v. Seven Falls Co.*, 515 U.S. 277, 286–87, 115 S.Ct. 2137, 132 L.Ed.2d 214 (1995) (emphasis in original and citations omitted).

The Second Circuit has subsequently affirmed a district court's refusal to entertain a declaratory judgment action based on a "detailed analysis" of the following five factors: (1) "whether the judgment

---

**10.** Rule 17(c) provides that "[o]n motion made promptly, the court may quash or modify the subpoena if compliance would be un- reasonable or oppressive." Fed. R. Crim P. 17(c)(2).

will serve a useful purpose in clarifying or settling the legal issues involved"; (2) "whether a judgment would finalize the controversy and offer relief from uncertainty"; (3) "whether the proposed remedy is being used merely for 'procedural fencing' or a 'race to res judicata'"; (4) "whether the use of a declaratory judgment would increase friction between sovereign legal systems or improperly encroach on the domain of a state or foreign court"; and (5) "whether there is a better or more effective remedy." *Dow Jones & Co., Inc. v. Harrods Ltd.*, 346 F.3d 357, 359–60 (2d Cir.2003) (citations omitted).

■ Based on *Wilton* and *Dow Jones*, it is concluded that this Court possesses broad discretion concerning whether to exercise its jurisdiction to entertain a declaratory judgment action.

### 1. The Availability of a More Appropriate Remedy

■ While conceding that the existence of another adequate remedy normally does not preclude declaratory judgment, the government asserts that pursuant to the advisory committee notes to Rule 57, Fed. R.Civ.P.,[11] a declaratory judgment should not be granted where a special statutory proceeding has been provided for the adjudication of the issue in dispute. The advisory committee notes relating to the 1937 adoption of Rule 57 state as follows:

A declaration may not be rendered if a special statutory proceeding has been provided for the adjudication of some special type of case, but general ordinary or extraordinary legal remedies, whether regulated by statute or not, are not deemed special statutory proceedings.

*Id.* The government contends that just such a special statutory proceeding is available in this case: a motion to quash under Fed.R.Crim.P. 17(c).[12] According to The Times, a motion to quash is not a special statutory proceeding. However, neither party has cited authorities that define "special statutory proceeding" or that provide a criteria for determining whether a given proceeding constitutes a "special statutory proceeding."

An influential commentator has provided the following useful description of the special statutory proceedings that are contemplated by the advisory notes to Rule 57:

It has already been noted that the declaratory action was not designed to interfere with the jurisdiction of special courts, but that on the contrary courts within their respective jurisdictions over persons and subject-matter were authorized by the Declaratory Judgment Acts to render declaratory judgments. Thus, when a probate court has jurisdiction over the construction of wills and matters of guardianship, it was not intended that courts of general jurisdiction should oust the jurisdiction of such special tribunals. In analogy thereto, where a special *statutory* procedure has been provided as an exclusive remedy for the particular type of case in hand, such as income tax assessment, tax abatement, workmen's compensation, unemployment compensation, annulment of a bigamous

**11.** Rule 57 provides, in pertinent part, as follows:

The procedure for obtaining a declaratory judgment pursuant to [28 U.S.C. § 2201] ... shall be in accordance with these rules and the right to trial by jury may be demanded under the circumstances and in the manner provided in Rule 38 and 39. The existence of another adequate

remedy does not preclude a judgment for declaratory relief in cases where it is appropriate.... Fed.R.Civ.P. 57.

**12.** The government argues that Rule 17 is a form of statute because it is referenced in 18 U.S.C. § 3484.

marriage, that specific recourse must be followed. Thus, a court should not by declaratory judgment ordinarily interfere with the jurisdiction of an administrative commission, especially where the statute is not ambiguous and where the jurisdiction of the committee depends on a jurisdictional fact ... which the commission must in first instance determine. Edwin Borchard, *Declaratory Judgments,* at 342–43 (2d ed.1941) (citations omitted and emphasis in original). Borchard's definition of the term "special statutory proceeding"—*i.e.,* that it denotes a procedure that is intended as the exclusive means for the adjudication of a particular category of case (*e.g.,* income tax assessment cases or workers' compensation claims)—is regarded as authoritative. *See, e.g., Lac D'Amiante du Quebec, Ltee v. American Home Assur. Co.,* 864 F.2d 1033, 1042 (3d Cir. 1988); *Washington Terminal Co. v. Boswell,* 124 F.2d 235, 260 (D.C.Cir.1941); *Upham v. Dill,* 195 F.Supp. 5, 10 (S.D.N.Y. 1961).

The cases cited in the parties' motion papers appear consistent with the above-described narrow definition of the term "special statutory proceeding." Those cases identified only three types of proceedings that have been recognized as "special statutory proceedings": (1) petitions for habeas corpus and motions to vacate criminal sentences, *see, e.g., Clausell v. Turner,* 295 F.Supp. 533, 536 (S.D.N.Y.1969); (2) proceedings under the Civil Rights Act of 1964, *see, e.g., Katzenbach v. McClung,* 379 U.S. 294, 296, 85 S.Ct. 377, 13 L.Ed.2d 290 (1964); and (3) certain administrative proceedings. *See, e.g., Deere & Co. v. Van Natta,* 660 F.Supp. 433, 436 (M.D.N.C.1986) (involving a proceeding for decision on patent validity before U.S. patent examiners).

The procedure to quash a subpoena pursuant to Rule 17(c) does not fit the above-described narrow definition of the term "special statutory proceeding" because it was not adopted as the exclusive means of adjudicating a particular type of claim. Moreover, under the government's construction, the "special statutory proceeding" exception to Rule 57 would overwhelm the rule. That is, under the government's theory, any procedure available under the Federal Rules of Criminal Procedure or the Federal Rules of Civil Procedure (all of which are referenced in the United States Code) would suffice to satisfy the "special statutory proceeding" requirement, and the Declaratory Judgment Act would be rendered largely nugatory.

In the alternative, the government argues that in comparison to a declaratory judgment action, a motion to quash under Rule 17(c) is a more efficient and less cumbersome device for challenging the propriety of a grand jury subpoena. In particular, the government has raised concerns that discovery in this action might prove unwieldy or might improperly encroach upon grand jury secrecy. However, on the facts presented thus far, neither party has sought discovery of evidence put before the grand jury, and neither party has argued that it has suffered prejudice as a result of the absence of such evidence.

Moreover, an efficient mechanism exists for the disposition of any petitions for disclosure of grand proceedings that might arise during the course of this action. *See* Fed.R.Crim.P. 6(e)(3)(E)(i).[13] Pursuant to this mechanism, the district court for the Northern District of Illinois would retain

---

**13.** Rule 6(e)(3) provides, in pertinent part, as follows:

(E) The court may authorize disclosure— at a time, in a manner, and subject to any other conditions that it directs—of a grand-jury matter:
(i) preliminarily to or in connection with a judicial proceeding. . . .
Fed.R.Crim.P. 6(e)(3)(E)(i).

substantial control over any such petition: "[a] petition to disclose a grand-jury matter ... must be filed in the district where the grand jury convened[,]" Fed.R.Crim.P. 6(e)(3)(F), and the petitioned court has authority to rule on the petition if it can "reasonably determine whether disclosure is proper...." Fed.R.Crim.P. 6(e)(3)(G). Furthermore, in the event that it were to grant such a petition, the district court for the Northern District of Illinois has authority to direct disclosure "at a time, in a manner and subject to any other conditions that it directs." Fed.R.Crim.P. 6(e)(3)(E).

More fundamentally, a motion to quash cannot, as the government claims, provide The Times with the same relief provided by a declaratory judgment. Rule 17(c), Fed.R.Crim.P., provides no authority or mechanism for a court to quash potential subpoenas that have been threatened but which have not yet been issued, and Rule 17(c) does not provide an avenue for relief in situations where subpoenas have been issued and there has been full compliance by the subpoenaed party. In contrast, an action for declaratory judgment pursuant to 28 U.S.C. § 2201(a)—"which allows the court to declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought," provides potential relief as to those records that have already been obtained as well as those that the government is currently seeking to obtain. See, e.g., Doe v. Harris, 696 F.2d 109, 114 (D.C.Cir.1982) (holding that an individual whose records were subpoenaed from a third-party in a grand jury investigation had the right to seek declaratory relief concerning those subpoenas and the issuance of future subpoenas by any U.S. Attorney's Office).

The government also argues that the Court should decline to entertain the present action because The Times has engaged in a form of procedural fencing, whereby it has attempted to circumvent the Federal Rules of Criminal Procedure to obtain an inappropriate tactical advantage. Since, on the facts set forth above, The Times cannot properly avail itself of the remedy afforded by Rule 17(c), there is no merit to the argument that The Times is attempting to circumvent the rule.

Based on the foregoing, the government has failed to demonstrate the existence of a more appropriate remedy that would justify refusal to entertain The Times' declaratory judgment action.

### 2. The Availability of a More Appropriate Venue

▪ The government has not moved to dismiss this action pursuant to Rule 12(b)(3), Fed.R.Civ.P., on the ground of improper venue,[14] and it has not moved for a transfer of venue for the convenience of the parties pursuant to 28 U.S.C. § 1404(a). Nonetheless, the government has contended that this Court should re-

---

14. Section 1391(e) of Title 28 provides in pertinent part as follows:

A civil action in which a defendant is an officer or employee of the United States or any agency thereof acting in his official capacity or under color of legal authority, or an agency of the United States, or the United States, may, except as otherwise provided by law, be brought in any judicial district in which (1) a defendant in the action resides, (2) a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or (3) the plaintiff resides if no real property is involved in the action.
28 U.S.C. § 1391(e). Pursuant to § 1391(e)(2)(3) venue has been properly laid in this district: A substantial portion of the events giving rise to this claim are alleged to have occurred here (Compl.¶ 9), The Times is based here (Compl.¶ 10), and it may be presumed that the records at issue are in this district.

frain from entertaining this action so that the issues raised by The Times can be decided by the U.S. District Court for the Northern District of Illinois.

■ The government argues that if the Court entertains this action, it could lead to wide-scale disruption of grand jury investigations by declaratory judgment actions scattered throughout multiple jurisdictions. To prevent such disruptions to grand jury proceedings, the government argues that this Court should adopt a *per se* rule that declaratory judgment actions to adjudicate issues relating to the compulsion of evidence by a grand jury may only be brought in the district where the grand jury sits. There is no support for such a *per se* rule in the plain text of 28 U.S.C. § 2201(a). Moreover, Section 2201(a) enumerates certain types of disputes (*e.g.* those arising under 11 U.S.C. § 1146, 26 U.S.C. § 7428, and 19 U.S.C. § 1516a(f)(10)) for which declaratory judgment is unavailable, suggesting that declaratory judgment is generally available in other contexts. Nor has the government pointed to any other legal authority in support of its proposed *per se* rule. In the absence of any such authority, the Court declines to adopt this broad limitation on the availability of declaratory judgment.

Furthermore, in light of The Times' substantial connection to this district, its choice of forum is entitled to substantial deference. *See, e.g., Wiwa v. Royal Dutch Petroleum Co.*, 226 F.3d 88, 101 (2d Cir. 2000) ("While any plaintiff's selection of a forum is entitled to deference, that deference increases as the plaintiff's ties to the forum increase."). Finally, the facts of

this case do not implicate the forum-shopping concerns identified by the *Dow Jones* court: Use of a declaratory judgment here will neither increase friction between sovereign legal systems nor improperly encroach on the domain of a state or foreign court. *See Dow Jones*, 346 F.3d at 359–60.

### 3. *The Appropriateness of the Relief Sought*

The government argues that through this declaratory judgment action The Times seeks unwarranted and inappropriate injunctive relief. As previously stated, *see supra* note 5, The Times is not pressing its request for injunctive relief in connection with the motions and cross-motion addressed here. Moreover, the determination as to the existence and application of an evidentiary privilege is not, as the government contends, tantamount to a permanent injunction.

Under the principles and authorities set forth above, the government's motion to dismiss the declaratory judgment action on Rule 12(b) grounds is denied.

### III. *The Government's Cross–Motion For Summary Judgment Is Granted As To Count IV Of The Complaint, And The Times' Motion As To The Same Count Is Denied*

As Count IV of its complaint, The Times has asserted that the government has failed to comply with the DOJ's Guidelines with regard to the telephone records sought here and that, as a result, the government should be barred from seeking or obtaining those telephone records. The Guidelines in question, set forth in 28 C.F.R. § 50.10,[15] address, *inter alia*, the

---

15. *See also* U.S. Department of Justice, *United States Attorneys' Manual* § 9–13.400 (1999) ("It is the Department's policy to protect freedom of the press, the news gathering function, and news media sources. Therefore, all attorneys contemplating the issuance of ...

subpoenas, the interrogation of a member of the new[s] media, or the initiation of criminal proceedings against a member of the news media should be aware of the requirements of 28 C.F.R. § 50.10.").

issuance of subpoenas to members of the media by the DOJ and the issuance of subpoenas for telephone records of members of the media. According to The Times, the Guidelines offer protection to a reporter's confidential source information and that protection should be extended to the telephone records sought here. In opposition, the government has argued that the Guidelines do not support a private cause of action.

Initially announced in 1970 in what then-Attorney General John N. Mitchell termed an effort "to prohibit federal law enforcement officers from annexing the media as an investigative arm," [16] and subsequently amended in 1980 to provide protection for telephone records of members of the media,[17] the Guidelines reflect a fundamental concern with "strik[ing] the proper balance between the public's interest in the free dissemination of ideas and information and the public's interest in effective law enforcement and the fair administration of justice." 28 C.F.R. § 50.10(a); *see also* 28 C.F.R. § 50.10(m) (noting "the intent of this Section to protect freedom of the press, news gathering functions, and news media sources ...").

This concern was expressly articulated in the Guidelines' preamble:

Because freedom of the press can be no broader than the freedom of reporters to investigate and report the news, the prosecutorial power of the government should not be used in such a way that it impairs a reporter's responsibility to cover as broadly as possible controversial public issues. This policy statement is thus intended to provide protection for the news media from forms of compulsory process, whether civil or criminal, which might impair the news gathering function.

28 C.F.R. § 50.10. In accordance with the stated interests, the Guidelines are to be "adhered to by all members of the Department in all cases" in order to balance "the concern that the Department of Justice has for the work of the news media and the Department's obligation to the fair administration of justice...." 28 C.F.R. § 50.10.

By their terms, the Guidelines require members of the DOJ not to issue subpoenas to members of the news media in criminal cases before: (1) negotiations with the media members concerned have been pursued, during which negotiations the government has clarified its needs in the case and its willingness to respond to the media member's concerns; and (2) the Attorney General has authorized the subpoena. *See* 28 C.F.R. § 50.10(c) & (e). The Guidelines further caution that "[a]ll reasonable attempts should be made to obtain information from alternative sources before considering issuing a subpoena to a member of the news media...." 28 C.F.R. § 50.10(b).

In criminal cases, a request for the authorization of the Attorney General to is-

**16.** *Quoted in* Daniel Scardino, *Vanessa Leggett Serves Maximum Jail Time, First Amendment–Based Reporter's Privilege Under Seige,* 19 Comm. Law. 1, 16 (Winter 2002).

**17.** *See* Policy With Regard to Issuance of Subpoenas to Members of News Media, Subpoenas for Telephone Toll Records of Members of News Media, and Interrogation, Indictment, or Arrest of, Members of News Media, 45 Fed.Reg. 76,436 (Nov. 19, 1980) (to be codified at 28 C.F.R. § 50.10). The amendment of the Guidelines in 1980 was prompted by the disclosure that the DOJ had obtained the telephone records of The Times' Atlanta bureau and the home telephone records of the bureau's chief by subpoena and directed the telephone company not to notify The Times of the subpoenas for a period of ninety days, thereby ensuring that no timely challenge to the subpoenas would be mounted. *See* Robert Pear, *Justice Dept. Restricts Subp[oe]nas for Reporters and Phone Records,* N.Y. Times, Nov. 13, 1980, at A30.

sue a subpoena to members of the news media is to be guided by the principle that,

> [T]here should be reasonable grounds to believe, based on information obtained from nonmedia sources, that a crime has occurred, and that the information sought is essential to a successful investigation—particularly with reference to directly establishing guilt or innocence. The subpoena should not be used to obtain peripheral, nonessential, or speculative information.

28 C.F.R. § 50.10(f)(1). In addition, requests for authorization are subject to the principle that, absent "exigent circumstances," subpoenas to members of the media "should ... be limited to the verification of published information and to such surrounding circumstances as relate to the accuracy of the published information." 28 C.F.R. § 50.10(f)(4). Moreover,

> Subpoenas should, wherever possible, be directed at material information regarding a limited subject matter, should cover a reasonably limited period of time, and should avoid requiring production of a large volume of unpublished material. They should give reasonable and timely notice of the demand for documents.

28 C.F.R. § 50.10(f)(6).

With respect to subpoenas for the telephone records of a member of the media, the Guidelines provide that, prior to seeking a subpoena, the government should have pursued all reasonable alternative investigation steps and that no subpoena may be issued absent the Attorney General's express authorization. *See* 28 C.F.R. § 50.10(b), (e) & (g)(1). Where such authorization is being sought,

> There should be reasonable ground to believe that a crime has been committed and that the information sought is essential to the successful investigation of that crime. The subpoena should be as narrowly drawn as possible; it should be directed at relevant information regard-

ing a limited subject matter and should cover a reasonably limited time period. 28 C.F.R. § 50.10(g)(1). The Guidelines direct that negotiations with the affected member of the media shall be pursued in all cases in which a subpoena for telephone records is contemplated if it is determined that such negotiations would not pose a substantial threat to the integrity of the underlying investigation. *See* 28 C.F.R. § 50.10(d). They further direct that timely notice of the Attorney General's determination to authorize a subpoena for telephone records and the DOJ's intent to issue a subpoena shall be provided to the media member where such negotiations have occurred. *See* 28 C.F.R. § 50.10(g)(2). There is no requirement that further notice concerning the actual issuance of the subpoena be provided to the media member with whom negotiations have occurred. *But cf.* 28 C.F.R. § 50.10(g)(3) (providing that, when a subpoena for telephone records has been issued without prior notice, "notification of the subpoena shall be given the member of the news media as soon thereafter as it is determined that such notification will no longer pose a clear and substantial threat to the integrity of the investigation").

The Guidelines, by their own terms, "are not intended to create or recognize any legally enforceable right in any person." 28 C.F.R. § 50.10(n). Drawing on this language, several courts of other circuits have concluded that no private cause of action to enforce the Guidelines exists. *See, e.g., In re Grand Jury Subpoena, Judith Miller,* 397 F.3d 964, 976 (D.C.Cir. 2005) ("Given the nature of the guidelines themselves, and the function they govern, we conclude that the guidelines provide no enforceable rights to any individuals, but merely guide the discretion of the prosecutors."); *In re Shain,* 978 F.2d 850, 854 (4th Cir.1992) (concluding that DOJ attorneys had complied with the Guidelines and that,

in any event, the Guidelines were "of the kind to be enforced internally" only); *In re Grand Jury Subpoena American Broadcasting Cos., Inc.,* 947 F.Supp. 1314, 1322 (E.D.Ark.1996) (observing that, even if an appointed Independent Counsel were required to comply with the Guidelines, contrary to the language of 28 U.S.C. § 594(f), the Guidelines, "by their own terms, confer no enforceable right on the subpoenaed person"); *see also In re Special Proceedings,* 373 F.3d 37, 44 n. 3 (1st Cir.2004) (noting that the Guidelines disclaim creation of legally enforceable rights and that "[c]ase law points in the same direction") (citations omitted). In other words, the Guidelines are " 'of the kind to be enforced internally by a governmental department, and not by courts.' " *In re Grand Jury Proceedings No. 92–4,* 42 F.3d 876, 880 (4th Cir.1994) (quoting *In re Shain,* 978 F.2d at 854).

Notwithstanding the express disclaimer set forth in subsection (n) of the Guidelines, The Times takes the position that the Guidelines are both binding and privately enforceable, citing two cases in which district courts have quashed subpoenas issued to reporters. *See United States v. Blanton,* 534 F.Supp. 295, 297 (S.D.Fla. 1982) (holding that "if the party seeking the information is the United States, it must follow the Department of Justice guidelines, 28 C.F.R. § 50.10" and concluding that the government had "failed to meet the legal tests set forth"); *cf. In re Williams,* 766 F.Supp. at 371 (stating that the court had "considered" the Guidelines in arriving at the decision to quash a grand jury subpoena directed at a reporter and observing that "[i]t is manifestly clear that the government has not discharged the obligation imposed by these regulations").

In invoking the Guidelines, the courts in both *Blanton* and *Williams* relied upon *Morton v. Ruiz,* 415 U.S. 199, 94 S.Ct. 1055, 39 L.Ed.2d 270 (1974), as has The

Times here, for the proposition that "[w]here the rights of individuals are affected, it is incumbent upon agencies to follow their own procedures. This is so even where the internal procedures are possibly more rigorous than otherwise would be required." *Ruiz,* 415 U.S. at 235, 94 S.Ct. 1055; *see In re Williams,* 766 F.Supp. at 371 n. 13 (citing *Ruiz* ); *Blanton,* 534 F.Supp. at 297 (same). In *Ruiz,* the Court held that, before the Bureau of Indian Affairs could extinguish "the entitlement of ... otherwise eligible beneficiaries, it must comply, at a minimum, with its own internal procedures" concerning the publication of an "extremely significant eligibility requirement, affecting rights of needy Indians." *Ruiz,* 415 U.S. at 235, 94 S.Ct. 1055. The *Ruiz* Court concluded that the publication requirement was intended to confer a benefit on potential beneficiaries, and therefore declined to affirm the attempt of the Bureau of Indian Affairs to limit the availability of general assistance benefits based upon unpublished eligibility requirements. *See id.* at 236, 94 S.Ct. 1055.

While the Guidelines at issue here announce the DOJ's "intent[ ] to provide protection for the news media from forms of compulsory process," 28 C.F.R. § 50.10, and its further intent "to protect freedom of the press, news gathering functions, and news media sources," 28 C.F.R. § 50.10(m), these expressions of intent simply reflect the goals underlying the DOJ's policy with respect to the exercise of prosecutorial discretion in the context of dealings with members of the media. *See In re Grand Jury Subpoena, Judith Miller,* 397 F.3d at 976 (concluding that the Guidelines "merely guide the discretion of the prosecutors"). It is neither the nature nor the purpose of the Guidelines to confer a legally enforceable benefit or right in any person, as they expressly acknowl-

edge, *see* 28 C.F.R. § 50.10(n),[18] rendering *Ruiz* and its progeny inapposite. *See In re Grand Jury Subpoena, Judith Miller,* 397 F.3d at 976–77.

■■■ Because the Guidelines are just that—touchstones to assist the DOJ in its exercise of prosecutorial discretion—and confer no substantive rights or protections such as may be privately enforced, the government's motion for summary judgment as to Count IV is granted, and The Times' motion for summary judgment as to that same count is denied.

## IV. *The Times' Motion For Summary Judgment As To Counts II and III Is Granted And The Government's Cross–Motion For Summary Judgment On Those Same Counts Is Denied*

### A. *There Is A Qualified Reporter's Privilege Under The First Amendment*

According to The Times, the First Amendment to the U.S. Constitution prohibits a grand jury from compelling disclosure of a journalist's confidential sources unless it first meets a stringent test reflecting a paramount public interest in the existence and maintenance of a press capable of furthering unfettered debate about matters of public interest. According to the government, a grand jury's efforts to compel disclosure of a reporter's confidential source do not implicate the First Amendment unless the grand jury investigation is conducted in bad faith, without legitimate law enforcement purpose, or to harass the press and disrupt relationships with news sources.

The resolution of this question hinges on the interpretation of *Branzburg v. Hayes,* 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972), which concerned First Amendment claims asserted by reporters who had been held in contempt either for failure to appear or for failure to testify before grand juries investigating criminal conduct of which the reporters had gained knowledge in the course of preparing stories for publication. In *Branzburg,* the reporters argued that their newsgathering activities were protected by a qualified First Amendment privilege, pursuant to which

[a] reporter should not be forced either to appear or to testify before a grand jury or at trial until and unless sufficient grounds are shown for believing that the reporter possesses information relevant to a crime the grand jury is investigating, that the information the reporter has is unavailable from other sources, and that the need for the information is sufficiently compelling to override the claimed invasion of First Amendment interests occasioned by the disclosure.

*Branzburg,* 408 U.S. at 680, 92 S.Ct. 2646.

In a 5–4 decision, the Supreme Court upheld the contempt convictions. The *Branzburg* majority stated: "The issue in these cases is whether requiring newsmen to appear and testify before state or federal grand juries abridges the freedom of speech and press guaranteed by the First Amendment. We hold that it does not." *Id.* at 667, 92 S.Ct. 2646. At the end of the majority opinion, the Court noted that "news gathering is not without its First Amendment protections, and grand jury investigations if instituted or conducted other than in good faith, would pose wholly

18. A similar caveat is found in the language of the DOJ's death penalty protocol contained in the United States Attorneys' Manual, which protocol consists of an internal DOJ policy directing the exercise of prosecutorial discre-

tion that courts have almost uniformly concluded confers no enforceable rights on a criminal defendant. *See generally In re United States,* 197 F.3d 310, 315–16 (8th Cir.1999) (collecting cases).

different issues for resolution under the First Amendment." *Id.* at 707, 92 S.Ct. 2646.

Justice Powell, who joined the *Branzburg* majority, wrote a separate concurring opinion "to emphasize ... the limited nature of the Court's holding." *Id.* at 709, 92 S.Ct. 2646 (Powell, J., concurring). Justice Powell stated that "[t]he Court does not hold that newsmen, subpoenaed to testify before a grand jury, are without constitutional rights with respect to the gathering of news or in safeguarding their sources." *Id.* (Powell, J., concurring). Justice Powell proceeded to describe the proper framework for determining whether, pursuant to the rule adopted by the *Branzburg* majority, a given reporter can be compelled to appear and give testimony before a grand jury:

> [I]f the newsman is called upon to give information bearing only a remote and tenuous relationship to the subject of the investigation, or if he has some other reason to believe that his testimony implicates confidential source relationship without a legitimate need of law enforcement, he will have access to the court on a motion to quash and an appropriate protective order may be entered. The asserted claim to privilege should be judged on its facts by the striking of a proper balance between freedom of the press and the obligation of all citizens to give relevant testimony with respect to criminal conduct. The balance of these vital constitutional and societal interests on a case-by-case basis accords with the tried and traditional way of adjudicating such questions.

*Id.* at 710, 92 S.Ct. 2646 (Powell, J., concurring). This language is prescient in view of the particular issue here presented.

In light of Justice Powell's concurring opinion, courts and commentators have differed on how to categorize the opinion of the majority written by Justice White.[19] Some courts have taken the position that Justice White wrote for a plurality of the Court and that the scope of the *Branzburg* holding is controlled by Justice Powell's narrow concurrence. *See, e.g., United States v. Smith,* 135 F.3d 963, 969 (5th Cir.1998) (citing *In re Selcraig,* 705 F.2d 789, 793 (5th Cir.1983)); *In re Grand Jury 87–3 Subpoena Duces Tecum,* 955 F.2d 229, 232 (4th Cir.1992); *see also* Robert D. Sack, *Sack on Defamation* § 14.3.2 at 14–13—14–14 (3d ed.2004) (stating that "[b]ecause Justice White's plurality opinion was rather enigmatic and Justice Powell was the pivotal fifth vote, his concurring opinion has been treated as authoritative"). And at least one court has acknowledged at least the possibility that "[s]ince the [four] dissenting Justices would have gone further than Justice Powell in recognition of the reporter's privilege, and preferred his position to that of the majority opinion ..., maybe his opinion should be taken to state the view of the majority of the Justices...." *McKevitt v. Pallasch,* 339 F.3d 530, 532 (7th Cir.2003).

Other courts have concluded that Justice White wrote for the majority and that Justice Powell's concurring opinion "neither limits nor expands upon its holding." *In re Grand Jury Proceedings,* 810 F.2d 580, 585 (6th Cir.1987); *see also In re*

19. As stated by Justice Stewart, "[In *Branzburg*], the Court rejected the [reporters'] claims by a vote of five to four, or, considering Mr. Justice Powell's concurring opinion, perhaps by a vote of four and a half to four and a half." Potter Stewart, *"Or of the Press",* 26 Hastings L.J. 631 (1975), *reprinted* in 50 Hastings L.J. 705, 709 (1999); *see also* 1 John W. Strong, *McCormick on Evidence* § 76.2, at 288 (5th ed.1999) (stating that in *Branzburg,* the rejection of the First Amendment reporter's privilege "did not command an absolute majority of the Court").

*Grand Jury Subpoena, Judith Miller,* 397 F.3d at 970–971; *Silkwood v. Kerr–McGee Corp.,* 563 F.2d 433, 437 (10th Cir.1977).

Courts also differ as to what, exactly, the *Branzburg* court actually held. The Supreme Court, although it has not addressed the issue of a reporter's privilege since *Branzburg,* has subsequently stated that "the First Amendment [does not] relieve a newspaper reporter of the obligation shared by all citizens to respond to a grand jury subpoena and answer questions relevant to a criminal investigation, even though the reporter might be required to reveal a confidential source." *Cohen v. Cowles Media Co.,* 501 U.S. 663, 669, 111 S.Ct. 2513, 115 L.Ed.2d 586 (1991); *see also University of Pennsylvania v. E.E.O.C.,* 493 U.S. 182, 201, 110 S.Ct. 577, 107 L.Ed.2d 571 (1990).

Some circuit courts have taken the position that, in light of Justice Powell's concurrence, *Branzburg* recognized some form of a qualified First Amendment reporter's privilege. *See, e.g., Ashcraft v. Conoco, Inc.,* 218 F.3d 282, 287 (4th Cir. 2000); *United States v. LaRouche Campaign,* 841 F.2d 1176, 1181 (1st Cir.1988); *United States v. Cuthbertson,* 630 F.2d 139, 147 (3d Cir.1980); *Silkwood,* 563 F.2d at 437.

Other courts read *Branzburg* for the proposition that "there is no First Amendment privilege protecting journalists from appearing before a grand jury or otherwise providing evidence to a grand jury regardless of any confidence promised by the reporter to any source." *In re Grand Jury Subpoena, Judith Miller,* 397 F.3d at 969–970; *see also In re Grand Jury Proceedings,* 5 F.3d 397, 400 (9th Cir.1993); *In re Grand Jury Proceedings (Storer Communications, Inc. v. Giovan),* 810 F.2d 580, 583 (6th Cir.1987).

The first case from this circuit to interpret *Branzburg* was *Baker v. F & F Investments,* 470 F.2d 778 (2d Cir.1972), *cert.*

*denied,* 411 U.S. 966, 93 S.Ct. 2147, 36 L.Ed.2d 686 (1973), in which the Second Circuit affirmed a district court's refusal to order a journalist to disclose the identity of a confidential source to the plaintiffs in a federal civil rights class action. *See Baker,* 470 F.2d at 785. While the *Baker* court took the position that *Branzburg* did not control the outcome of the dispute before it, it did suggest that *Branzburg* could be read to recognize the existence of a qualified privilege that required case-by-case balancing of the interests militating for and against disclosure of a journalist's confidential source. *Id.* at 784. The *Baker* court stated:

> Significantly, [Justice Powell] said that even in criminal proceedings, "[t]he asserted claim to privilege should be judged on its facts by the striking of a proper balance between freedom of the press and the obligation of all citizens to give relevant testimony with respect to criminal conduct. The balance of these vital constitutional and societal interests on a case-by-case basis accords with the tried and traditional way of adjudicating such questions."

*Id.* at 784 (quoting *Branzburg,* 408 U.S. at 710, 92 S.Ct. 2646 (Powell, J., concurring)).

Ten years later, in *In re Petroleum Products Antitrust Litig.,* 680 F.2d 5 (2d Cir.), *cert. denied sub nom. Arizona v. McGraw–Hill, Inc.,* 459 U.S. 909, 103 S.Ct. 215, 74 L.Ed.2d 171 (1982), the Second Circuit vacated an order imposing civil contempt sanctions on a publisher who refused to disclose to civil litigants the identities of certain of its confidential sources. *See In re Petroleum Products,* 680 F.2d at 9. The *Petroleum Products* court held that the parties seeking disclosure had failed to make the requisite initial showing justifying such disclosure. The court stated:

The law in this Circuit is clear that to protect the important interests of reporters and the public in preserving the confidentiality of journalists' sources, disclosure may be ordered only upon a clear and specific showing that the information is: [1] highly material and relevant, [2] necessary or critical to the maintenance of the claim, and [3] not obtainable from other available sources. *Id.* at 7 (quoting *Baker,* 470 F.2d at 783–85) (quotation marks omitted). Like the *Baker* court before it, the *Petroleum Products* court distinguished *Branzburg* on the ground that its holding was "limited to the grand jury setting." *Id.* at 9 n. 12. Nonetheless, the *Petroleum Products* court cited a portion of the *Branzburg* majority opinion [20] for the proposition that a party seeking disclosure of a reporter's confidential sources had the "burden of first seeking the information elsewhere." *Id.* at 8 (citing *Branzburg,* 408 U.S. at 706–07, 92 S.Ct. 2646).

A year later, in *United States v. Burke,* 700 F.2d 70 (2d Cir.), *cert. denied,* 464 U.S. 816, 104 S.Ct. 72, 78 L.Ed.2d 85 (1983), the Second Circuit affirmed the quashing of a subpoena by which a criminal defendant sought to compel a publisher to produce notes and other work papers relating to a magazine article co-authored by the prosecution's principal witness. *See Burke,* 700 F.2d at 78. The *Burke* court held that the qualified privilege articulated by the *Petroleum Products* court applied with equal force in criminal cases, *see id.* at 77, stating that:

> no legally-principled reason [existed] for drawing a distinction between civil and criminal cases when considering whether the reporter's interest in confidentiality

should yield to the moving party's need for probative evidence.

*Id.* The *Burke* court stated that the application of the *Petroleum Products* rule in the context of a criminal trial comported with the *Branzburg* decision, which "recognized the need to balance First Amendment values even where a reporter is asked to testify before a grand jury ... [.]" *Id.* (citing *Baker,* 470 F.2d at 784–85). Applying the *Petroleum Products* three-factor test to the discovery dispute before it, the *Burke* court concluded that compelling the disclosure of the sought materials was not warranted because the party seeking disclosure had failed to make the requisite showing of necessity. *Id.* (stating that "the appellant has completely failed to make the clear and specific showing that these documents were necessary or critical to the maintenance of his defense").

Finally, the *Burke* court indicated that the qualified reporter's privilege previously recognized by the Second Circuit derives from the First Amendment. *See id.* The court stated that:

> There exists no absolute rule of privilege protecting newsmen from disclosure of confidential sources. Instead, what is required is a case by case evaluation and balancing of the legitimate competing interests of the newsman's claim to First Amendment protection from forced disclosure of his confidential sources, as against the [moveant's] claim [that disclosure is warranted].

*Id.* (quoting *United States v. Orsini,* 424 F.Supp. 229, 232 (E.D.N.Y.1976), *aff'd,* 559 F.2d 1206 (2d Cir.1977)).

In *von Bulow by Auersperg v. von Bulow,* 811 F.2d 136 (2d Cir.), *cert. denied sub nom. Reynolds v. Von Bulow by Auersperg,* 481 U.S. 1015, 107 S.Ct. 1891,

---

**20.** Specifically, the *Petroleum Products* court cited the majority's discussion of rules fashioned by the United States Attorney General for federal officials in connection with subpoenaing members of the press to testify before grand juries. *See In re Petroleum Products,* 680 F.2d at 8 (citing *Branzburg,* 408 U.S. at 706–07, 92 S.Ct. 2646).

95 L.Ed.2d 498 (1987), the Second Circuit affirmed a civil contempt order against a witness who refused to produce certain subpoenaed documents (*i.e.*, investigative reports, notes, and a book manuscript) to a civil litigant. *See von Bulow*, 811 F.2d at 146. The witness argued that the documents, which were either written by her or on her behalf, were protected from disclosure pursuant to a qualified First Amendment privilege. The Second Circuit held that the witness could not avail herself of the qualified First Amendment privilege because she had not generated the sought materials with the intention of disseminating information to the public. *See id.* at 147.

In so holding, the *von Bulow* court provided the following analysis of *Branzburg:*

> [T]he Supreme Court held that a journalist does not have an absolute privilege under the First Amendment to refuse to appear and testify before a grand jury to answer questions relevant to an investigation into the commission of crime.... The Court recognized, however, that a qualified privilege may be proper in some circumstances because *newsgathering* was not without First Amendment protection. [citation omitted].

*Id.* at 142 (emphasis in original). Based on *Branzburg*, the *von Bulow* court concluded that "the process of newsgathering is a protected right under the First Amendment, albeit a qualified one. This qualified right, which results in the journalist's privilege, emanates from the strong public policy supporting the unfettered communication of information by the journalist to the public." *Id.*

In *United States v. Cutler*, 6 F.3d 67 (2d Cir.1993), the Second Circuit had occasion to revisit the application of *Branzburg* in the criminal context. In *Cutler*, the Sec- ond Circuit affirmed in part and reversed in part a civil contempt order entered against newspaper and television reporters who had refused to produce unpublished notes and outtakes (*i.e.*, unedited, unbroadcast videotape footage) that had been subpoenaed by criminal defense attorney Bruce Cutler ("Cutler"), the defendant in a criminal contempt prosecution. *See Cutler*, 6 F.3d at 68–69. Cutler had sought the materials at issue to help him defend against a charge that, in the course of his representation of John Gotti ("Gotti"), he had intentionally and willfully violated Rule 7 of the Criminal Rules for the Southern and Eastern Districts of New York ("Local Criminal Rule 7"),[21] which limits the dissemination of public information by or on behalf of attorneys in connection with a pending criminal litigation.

The *Cutler* court acknowledged that *Burke* had recognized the existence of a qualified First Amendment reporter's privilege, *see id.* at 71, and it declined to address Cutler's argument that *Burke* was "at odds with the majority *Branzburg* view that there should be no special threshold test for the compulsion of a reporter's testimony before a grand jury or in a criminal case." *Id.* at 73. Rather, the *Cutler* court stated that it was required to follow *Branzburg* because the facts before it were sufficiently similar to those of *Branzburg, see id.* at 73, and the *Cutler* court appears to have engaged in some form of the *Petroleum Products* analysis to determine if disclosure of the sought materials was warranted. *See id.* at 73–74.

In holding that Cutler was entitled to both testimony from the reporters concerning his published statements and also unpublished notes and outtakes, the Second Circuit emphasized: (1) the necessity and relevance of such materials to Cutler's defense and (2) the fact that such materi-

---

**21.** Local Criminal Rule 7 is a predecessor to the current Local Criminal Rule 23.1.

als were not available from any other source. *See id.* The *Cutler* court stated:

> Other than Cutler's own testimony, which of course cannot be compelled, the evidence that Cutler seeks from the Reporters and the TV Stations is probably the *only* significant proof regarding his assertedly criminal behavior. Further, even if Cutler should choose to testify, we see no justification for consigning him to his unassisted memory when clearly relevant evidence is readily available from the Reporters and TV Stations. Finally, one of Cutler's major lines of defense is that the statements alleged to be contemptuous were in fact "repl[ies] to charges of misconduct" that are expressly precluded from the purview of Rule 7. That defense would be undercut if Cutler could not obtain relevant evidence regarding the context of his statements that is available only from the Reporters and the TV Stations.

*Id.* (emphasis and alteration in original).

In contrast, the court held that Cutler was not entitled to production of reporters' unpublished notes concerning statements by government officials about Gotti and the Gotti criminal prosecution, which Cutler sought for the purpose of demonstrating that the vast majority of publicity concerning the Gotti case came from sources other than Cutler. *See id.* at 74. The court took the position that such documents were not sufficiently material to justify compelled disclosure. *See id.* at 74–75. The court stated:

> The comparative impact of Cutler's public statements and other publicity regarding the Gotti Case manifestly depends upon what was published on that subject, not upon what is in the Reporters' unpublished notes. Similarly, the unpublished notes will cast no light on what Cutler was entitled to say "in response to *public allegations* that Mr. Cutler had engaged in misconduct," ... and will provide no assistance to Cutler in establishing that his statements "concerned matters other than the pending *Gotti* case." Finally, the content of the unpublished notes, by definition unknown to Cutler at the time that he made the statements upon which the contempt charges are premised, can hardly have affected his intent in making those statements.

*Id.* (emphasis in original).

Finally, it should be noted that the *Cutler* court stated that the *Burke* holding should be limited to its facts because *"Burke's* articulation of a general test applicable to all phases of a criminal trial was not necessary to the resolution of that case." *Id.* at 73.

In *Gonzales v. National Broadcasting Co., Inc.,* 194 F.3d 29, 36–37 (2d Cir.1999), the Second Circuit affirmed orders by a district court holding the National Broadcasting Company, Inc. ("NBC") in civil contempt and compelling NBC to produce certain outtakes from the news program *Dateline* to the parties to a federal civil rights action. In so holding, the *Gonzales* court affirmed that the Second Circuit had previously recognized the existence of a qualified privilege for nonconfidential information collected by reporters, and it concluded that the parties seeking this discovery had satisfied the *Petroleum Products* requirements for overcoming that qualified privilege. *See Gonzales,* 194 F.3d at 30. The *Gonzales* court stated that "where nonconfidential information is at stake, the showing needed to overcome the journalist's privilege is less demanding than for material acquired in confidence." [22] *Id.*

22. The *Gonzales* court observed that *Cutler,* in which the Second Circuit had affirmed that

the qualified privilege had been overcome,

The *Gonzales* court clarified two issues concerning the *Cutler* decision. First, *Gonzales* stated that "[a]lthough [the *Cutler* court] did not apply the standards for overcoming the privilege elucidated in *Petroleum Products*, it is clear [the *Cutler* court] proceeded on the assumption that ... a qualified journalists privilege applied, and the defendant had to show a sufficient need for the information to overcome the privilege." *Id.* at 34. Second, the *Gonzales* court stated that it understood *Cutler* to limit *Burke* to its facts only as to "how much of a showing was needed to *overcome* the privilege when the materials at issue were sought by a criminal defendant." *Id.* (emphasis in original). According to *Gonzales*, this limitation resulted from *Cutler's* view that "*Burke* undervalued the needs of criminal defendants in putting on a defense." *Id.*

Based upon the Second Circuit's interpretation of *Branzburg* in the cases just described, district courts in this circuit have recognized the existence of a qualified reporter's privilege derived from the First Amendment. *See, e.g., Aequitron Medical, Inc. v. CBS, Inc.,* No. 93 Civ. 950(DC), 1995 WL 406157, at *2 (S.D.N.Y. Jul.10, 1995) (stating that pursuant to the First Amendment, "courts in this Circuit have recognized a qualified privilege for journalists to protect confidential sources and other information obtained during the newsgathering process") (citing *von Bulow,* 811 F.2d at 142); *PPM America, Inc. v. Marriott Corp.,* 152 F.R.D. 32, 35 (S.D.N.Y.1993) (stating that "on a case-by-case basis, federal courts weigh a reporter's claim to First Amendment protection from forced disclosure ...") (citing *Burke,* 700 F.2d 70, 76–77); *United States v. Sanusi,* 813 F.Supp. 149, 154 (E.D.N.Y.1992) (stating that "[t]he First Amendment privilege for newsgathering is not absolute" and can be overcome if the *Petroleum*

*Products* test is satisfied); *United States ex rel. Vuitton et Fils S.A. v. Karen Bags, Inc.,* 600 F.Supp. 667, 669 (S.D.N.Y.1985) (stating that the Second Circuit has recognized a qualified First Amendment reporter's privilege extending to both criminal and civil cases) (citing *Burke,* 700 F.2d at 77); *In re Forbes Magazine,* 494 F.Supp. 780, 781 (S.D.N.Y.1980) (applying *Baker* to determine whether reporter's First Amendment interest in the non-disclosure of confidential source had been overcome); *In re Application of Consumers Union of United States, Inc.,* 495 F.Supp. 582, 586 (S.D.N.Y.1980) (same).

▮▮▮▮ In view of the foregoing, it is concluded that the Second Circuit, based on *Branzburg,* has recognized a qualified First Amendment privilege, applicable in civil actions and in all phases of a criminal prosecution, that protects reporters from compelled disclosure of confidential sources. *See Burke,* 700 F.2d at 77. Pursuant to this qualified privilege, the party seeking disclosure must make "a clear and specific showing that the sought information is: [1] highly material and relevant, [2] necessary or critical to the maintenance of the claim, and [3] not obtainable from other available sources." *Id.* at 76–77 (quoting *In re Petroleum Products,* 680 F.2d at 7 (citing *Baker,* 470 F.2d at 783–85)). The burden to overcome the qualified privilege is diminished where: (1) the party seeking discovery is a criminal defendant, *see Gonzales,* 194 F.3d at 34 n. 3 (interpreting *Cutler,* 6 F.3d at 73) or (2) the sought materials are nonconfidential. *See id.* at 30.

▮▮▮▮ The government's contentions that this qualified privilege should not be applied in the context of a grand jury investigation do not overcome the conclusions set forth above.

also involved *nonconfidential* material. *See* *Gonzales,* 194 F.3d at 33.

First, the government argues that *Branzburg* did not recognize a privilege requiring case-by-case balancing of the interests militating for and against disclosure of a journalists' sources. The government argues that its position is buttressed by the recently decided *In re Grand Jury Subpoena, Judith Miller*, 397 F.3d 964 (D.C.Cir.2005) at 969–70, in which the District of Columbia Circuit flatly rejected the interpretation of *Branzburg* urged by The Times. *See In re Grand Jury Subpoena, Judith Miller*, 397 F.3d at 969–70. The District of Columbia Circuit took the position that the First Amendment provides no privilege protecting a reporter from appearing before or providing evidence to a grand jury. As described above, the proper interpretation of *Branzburg* is an issue that has divided those circuits that have had occasion to consider it, and the interpretation of *Branzburg* urged by the government is contrary to the view adopted by the Second Circuit and the courts of this district.

Moreover, the government's interpretation of *Branzburg*—*i.e.*, that it held that the First Amendment right of reporters to gather information from confidential sources does not include a right to resist giving evidence in a grand jury investigation where there is no evidence or claim that the investigation is being conducted in bad faith or for the purposes of harassment—is tautological. That is, regardless of whether First Amendment interests are implicated, the recipient of an abusive subpoena already has the right to move to quash under Fed.R.Crim.P. 17(c). *See, e.g., United States v. R. Enterprises, Inc.*, 498 U.S. 292, 299, 111 S.Ct. 722, 112 L.Ed.2d 795 (1991) (stating that "[g]rand juries are not licensed to engage in arbitrary fishing expeditions, nor may they select target of investigations out of malice or an intent to harass"); *In re Impounded*, 241 F.3d 308, 313 (3d Cir.2001). Furthermore, if the government is correct that

*Branzburg* only requires balancing where a grand jury subpoena is issued in bad faith or for the purpose of harassment, no balancing would ever be required: The legitimate First Amendment interest would always outweigh a subpoena issued in bad faith or for the purpose of harassment. The government's contention is too broad.

Second, the government argues that the *Burke* decision is not dispositive of the issue of whether a qualified First Amendment privilege exists in the grand jury context. Although the government acknowledges that the *Burke* court stated that courts should "balance First Amendment values even where a reporter is asked to testify before a grand jury," *Burke*, 700 F.2d at 77, the government argues that this statement should be disregarded because the *Burke* court allegedly misinterpreted *Branzburg* as well as the Second Circuit's decision in *Baker*. However, the government provides no meaningful analysis to support this assertion; it merely reiterates its preferred construction of the *Branzburg* holding.

The government has also contended that the *Burke* court's characterization of *Branzburg* should be disregarded as mere *dicta*. This argument ignores the fact that, to date, the Second Circuit has not had an opportunity to address how the qualified First Amendment reporter's privilege should be applied in the grand jury context. Under such circumstances, the guidance of *Burke* and other Second Circuit cases, albeit in *dicta*, warrants particular attention because it suggests how the Second Circuit might decided the issue if and when it is put before the Court of Appeals.

The government also argues that *Burke* is irrelevant to the question of whether the qualified First Amendment privilege is available in the grand jury context because

the *Cutler* court limited *Burke* to its facts. *See Cutler*, 6 F.3d at 73, 75. However, as noted above, the *Gonzales* court made clear that this limitation did not go to which phases of a criminal prosecution were subject to the rule adopted by *Burke*. *See Gonzales*, 194 F.3d at 34 n. 3. Rather, *Burke* was limited to its facts only on the issue of "how much of a showing was needed to *overcome* the privilege when the materials at issue were sought by a criminal defendant." *Id.* (emphasis in original).

In any event, the government has not offered a principled basis for concluding that the qualified First Amendment reporter's privilege applies in the context of a criminal trial but not in the context of a grand jury investigation. The Second Circuit has stated repeatedly that the application of the privilege (*i.e.*, the weight to be afforded to the interests militating for and against compelled disclosure) depends on the legal context in which the disclosure is sought. For example, the *Baker* court stated that the interests militating for disclosure of confidential sources in a civil case are less weighty than those militating for disclosure in a criminal investigation. *See Baker*, 470 F.2d at 784–85. The *Cutler* decision has been interpreted as holding that the interests militating for disclosure are more weighty when the party seeking disclosure is a criminal defendant. *See Gonzales*, 194 F.3d at 34 n. 3. And the *Gonzales* court held that the interests militating against disclosure are less weighty when the sought materials are nonconfidential. *See id.* at 30. All of these decisions, each of which was based on interpretation of *Branzburg*, were premised on the assumption that a qualified First Amendment privilege exists that requires case-by-case balancing. The scope of the reporter's privilege may vary depending on the context, but whether there is a qualified privilege rooted in the First Amendment is not dependent on the nature of the case.

As set forth above, The Times has demonstrated that there exists a qualified First Amendment reporter's privilege with respect to confidential sources.

**B. There Is A Qualified Reporter's Privilege Under The Common Law**

In addition to the constitutional protection discussed above, The Times has invoked the federal common law, which, The Times asserts, would provide an independent basis for granting summary judgment in favor of The Times.[23] Specifically, The Times has urged that a common law reporter's privilege protecting confidential sources should be recognized under Rule 501, Fed.R.Evid., in accordance with the methodology for recognizing privileges under Rule 501 set forth by the Supreme Court in *Jaffee v. Redmond*, 518 U.S. 1, 116 S.Ct. 1923, 135 L.Ed.2d 337 (1996). According to the government, no basis to recognize a federal common law reporter's privilege as to confidential sources exists, particularly in light of the holding and reasoning of *Branzburg v. Hayes*, 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972).

**1. Rule 501 and the Recognition of Federal Common Law Privileges**

Three years after *Branzburg* was decided, Congress enacted the Federal Rules of Evidence. Among the Rules adopted was Rule 501, which provides, in relevant part:

---

**23.** " 'Federal common law' ... means any federal rule of decision that is not mandated on the face of some authoritative federal text—whether or not that rule can be described as the product of 'interpretation' in either a conventional or an unconventional sense." Thomas W. Merrill, *The Common Law Powers of Federal Courts*, 52 U. Chi. L.Rev. 1, 5 (1985) (footnote omitted).

Except as otherwise required by the Constitution of the United States or provided by Act of Congress or in rules prescribed by the Supreme Court pursuant to statutory authority, the privilege of a witness, person, government, state, or political subdivision thereof shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience.

Fed.R.Evid. 501.

Prior to the adoption of Rule 501 in its current state, rules of evidence were proposed that defined nine specific testimonial privileges and indicated that these nine privileges were to be the exclusive privileges absent constitutional mandate, Act of Congress, or revision of the Rules. *See* Rules of Evidence for United States Courts and Magistrates, 56 F.R.D. 183, 230–61 (1972). Congress rejected this defined approach in favor of the more flexible mandate embodied in Rule 501. *See Jaffee,* 518 U.S. at 8 n. 7, 116 S.Ct. 1923; *Trammel v. United States,* 445 U.S. 40, 47, 100 S.Ct. 906, 63 L.Ed.2d 186 (1980). As the Supreme Court has since explained,

> In rejecting the proposed Rules and enacting Rule 501, Congress manifested an affirmative intention not to freeze the law of privilege. Its purpose rather was to "provide the courts with the flexibility to develop rules of privilege on a case-by-case basis," 120 Cong. Rec. 40891 (1974) (statement of Rep. Hungate), and to leave the door open to change. *See also* S.Rep. No.93–1277, p. 11 (1974); H.R.Rep. No.93–650, p. 8 (1973), U.S.Code Cong. & Admin. News 1974, p. 7051.

*Trammel,* 445 U.S. at 47, 100 S.Ct. 906 (internal footnote omitted); *see also In re Grand Jury Subpoena Dated Jan. 4, 1984,* 750 F.2d 223, 224 (2d Cir.1984) ("The Senate Report accompanying enactment of Rule 501 expressly stated that judicial

'recognition of a privilege based on a confidential relationship and other privileges should be determined on a case-by-case basis.' ") (quoting S.Rep. No. 93–1277, at 13 (1974), U.S.Code Cong. & Admin.News 1974, pp. 7051, 7059). Thus, the Federal Rules of Evidence that were eventually adopted specifically "acknowledge the authority of the federal courts to continue the evolutionary development of testimonial privileges in federal criminal trials 'governed by the principles of the common law as they may be interpreted ... in the light of reason and experience.' " *Trammel,* 445 U.S. at 47, 100 S.Ct. 906 (quoting Fed.R.Evid. 501) (alteration in original); *see also United States v. Weber Aircraft Corp.,* 465 U.S. 792, 803, n. 25, 104 S.Ct. 1488, 79 L.Ed.2d 814 (1984) ("Rule 501 was adopted precisely because Congress wished to leave privilege questions to the courts rather than attempt to codify them."); *Jaffee,* 518 U.S. at 9, 116 S.Ct. 1923 (observing that Rule 501 "did not freeze the law governing the privileges of witnesses in federal trials at a particular point in our history, but rather directed federal courts to 'continue the evolutionary development of testimonial privileges' ") (quoting *Trammel,* 445 U.S. at 47, 100 S.Ct. 906). As one court of this district has since commented, "Rule 501 is a rare, explicit congressional directive for fashioning federal common law." *In re Application of Dow Jones & Co., Inc.,* No. 98 Misc. 8–85(PKL), 1998 WL 883299, at *4 (S.D.N.Y. Dec. 17, 1998) (citing Martha A. Field, *Sources of Law: The Scope of Federal Common Law,* 99 Harv. L.Rev. 881, 935 n. 227 (1986)). Rule 501 applies to civil as well as criminal proceedings, and to proceedings before grand juries. *See* Fed.R.Evid. 1101.

Pursuant to Rule 501, the recognition and application of testimonial or other evidentiary privileges are governed by "the principles of the common law," as

interpreted "in the light of reason and experience." Fed.R.Evid. 501. As the Supreme Court noted in *Jaffee,* the common law principles underlying the recognition of privileges under Rule 501 "can be stated simply." *Jaffee,* 518 U.S. at 9, 116 S.Ct. 1923. At base is the principle recognized "[f]or more than three centuries ... that the public ... has a right to every man's evidence." *United States v. Bryan,* 339 U.S. 323, 331, 70 S.Ct. 724, 94 L.Ed. 884 (1950) (citation and quotation marks omitted); *accord University of Pennsylvania,* 493 U.S. at 189, 110 S.Ct. 577, 107 L.Ed.2d 571 (1990); *Jaffee,* 518 U.S. at 9, 116 S.Ct. 1923. Given the primacy of this principle, the Supreme Court has cautioned that new privileges ought not to be "lightly created nor expansively construed, for they are in derogation of the search for truth." *United States v. Nixon,* 418 U.S. 683, 710, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974) (footnote omitted); *accord University of Pennsylvania,* 493 U.S. at 189, 110 S.Ct. 577. Exceptions to the general rule may be justified, however, "by a 'public good transcending the normally predominant principle of utilizing all rational means for ascertaining truth.'" *Jaffee,* 518 U.S. at 9, 116 S.Ct. 1923 (citations omitted). In other words, an evidentiary privilege must "promote[ ] sufficiently important interests to outweigh the need for probative evidence" to be recognized under Rule 501. *Trammel,* 445 U.S. at 51, 100 S.Ct. 906.

■■■■■ Thus, to determine "in light of reason and experience," Fed.R.Evid. 501, whether an asserted privilege promotes sufficiently important interests so as to outweigh the countervailing need for probative evidence, the Court considers four factors, as set forth in *Jaffee:* (1) whether the asserted privilege would serve significant private interests; (2) whether the privilege would serve significant public interests; (3) whether those interests outweigh any evidentiary benefit that would result from rejection of the privilege proposed; and (4) whether the privilege has been widely recognized by the states. *See Jaffee,* 518 U.S. at 10–13, 116 S.Ct. 1923; *see also In re Special Counsel Investigation,* 338 F.Supp.2d 16, 18 (D.D.C.2004) (acknowledging that *Jaffee* "articulate[s] the analysis courts should undertake when determining whether to recognize a common law privilege under Rule 501"), *aff'd on other grounds by In re Grand Jury Subpoena, Judith Miller,* 397 F.3d 964 (D.C.Cir.2005). The language and broad applicability of Rule 501 suggests, and *Jaffee* confirms, that in determining whether to recognize a privilege through consideration of the various factors identified above, a court should not distinguish between criminal and civil cases, or between criminal trials and grand jury proceedings. *See also Cuthbertson,* 630 F.2d at 147.[24]

■■■■■ State precedent and the existence of consensus among the states are of particular importance in considering whether to recognize a privilege under Rule 501, as the Supreme Court has expressly recognized. *See Jaffee,* 518 U.S. at 12–13, 116 S.Ct. 1923 ("[T]he policy decisions of the States bear on the question whether federal courts should recognize a new privilege or amend the coverage of an existing one.") (citing *Trammel,* 445 U.S. at 48–50, 100 S.Ct. 906; *United States v. Gillock,* 445 U.S. 360, 368 n. 8, 100 S.Ct. 1185, 63 L.Ed.2d 454 (1980)); *see also*

---

**24.** This approach reflects the wisdom of avoiding the development of a context-specific, piecemeal law of privilege, whereby the suitability of recognizing a privilege must be relitigated each time the privilege is invoked, and, instead, permitting any context-based arguments concerning the appropriateness of enforcing a privilege in a given case to be addressed through the application of a recognized privilege to the circumstances of that case.

*Pearson v. Miller,* 211 F.3d 57, 67 (3d Cir.2000) ("The case for recognizing a particular federal privilege is stronger ... where the information sought is protected by a state privilege."); *United States v. King,* 73 F.R.D. 103, 105 (E.D.N.Y.1976) ("A strong policy of comity between state and federal sovereignties impels federal courts to recognize state privileges where this can be accomplished at no substantial cost to federal substantive and procedural policy.") (citation omitted). Thus, the absence of unanimity among the federal courts as to a particular privilege under Rule 501 does not preclude recognition of the privilege in question where the states have uniformly recognized that privilege. *See Jaffee,* 518 U.S. at 8, 14, 116 S.Ct. 1923. With respect to state precedent, the Supreme Court has deemed it "of no consequence that recognition of [a] privilege in the vast majority of States is the product of legislative action rather than judicial decision." *Id.* at 13, 116 S.Ct. 1923.

### 2. *A Qualified Common Law Reporter's Privilege Is Recognized Under Rule 501*

This case is not the first to pose the question of whether a reporter's privilege with respect to the protection of confidential sources arises under Rule 501 and the federal common law. The Court of Appeals for the Third Circuit answered the question in the affirmative in *Riley v. City of Chester,* 612 F.2d 708 (3d Cir.1979), explaining that,

> The strong public policy which supports the unfettered communication to the public of information, comment and opinion and the Constitutional dimension of that policy, expressly recognized in *Branzburg v. Hayes,* lead us to conclude that journalists have a federal common law privilege, albeit qualified, to refuse to divulge their sources. Such a privilege has also been recognized by many other courts which have considered this

question following the decision in *Branzburg v. Hayes.*

*Riley,* 612 F.2d at 715 (collecting cases). The following year, the Third Circuit held that *Riley* represented "persuasive authority" concerning the recognition of a qualified common law privilege in the context of a criminal trial in *United States v. Cuthbertson,* 630 F.2d 139 (3d Cir.1980), explaining,

> First, the interests of the press that form the foundation for the privilege are not diminished because the nature of the underlying proceeding out of which the request for the information arises is a criminal trial. [The press'] interest in protecting confidential sources, preventing intrusion into the editorial process, and avoiding the possibility of self-censorship created by compelled disclosure of sources and unpublished notes does not change because a case is civil or criminal.

*Cuthbertson,* 630 F.2d at 147; *see also In re Williams,* 766 F.Supp. at 371 (recognizing a qualified federal common law reporter's privilege in the grand jury setting).

Since that time, the courts of other circuits have repeatedly recognized the existence of a common law reporter's privilege, specifically denominated as such, in various contexts. *See, e.g., United States v. Foote,* No. 00–CR–20091–01 (KHV), 2002 WL 1822407, at *2 (D.Kan. Aug.8, 2002) (explaining that the Tenth Circuit has recognized "a qualified federal common law 'journalist's privilege'") (footnote omitted); *Howard v. Antilla,* 191 F.R.D. 39, 42 (D.N.H.1999) (construing the First Circuit's opinion in *Bruno & Stillman, Inc. v. Globe Newspaper Co.,* 633 F.2d 583 (1st Cir.1980), "to have fashioned a federal common law qualified privilege rule based on the First Amendment because the state jurisdictions involved had not codified a newsman's privilege and their common law

focused on the First Amendment origins of any such protection"); *McCarty v. Bankers Ins. Co.,* 195 F.R.D. 39, 44 (N.D.Fla. 1998) (stating that "the federal courts, including the Eleventh Circuit, and the district courts therein have overwhelmingly recognized a qualified privilege for journalists which allows them to resist compelled disclosure of their professional news gathering efforts and results, whether published or not"); *Cinel v. Connick,* 792 F.Supp. 492, 499 (E.D.La.1992) (concluding that the federal common law reporter's privilege recognized in the Fifth Circuit does not protect against the compelled disclosure of information unrelated to confidential sources). *But cf. In re Grand Jury Proceedings,* 5 F.3d at 403 (expressing disinclination to "undermine" *Branzburg* by recognizing a federal common law reporter's privilege in the context of grand jury proceedings). Most recently, the District of Columbia Circuit affirmed the lower court's ruling in *In re Special Counsel Investigation,* 338 F.Supp.2d 16 (D.D.C. 2004) (concluding that no federal common law privilege existed in the context of a grand jury proceeding), without reaching any determination as to the existence of a common law reporter's privilege. *See In re Grand Jury Subpoena, Judith Miller,* 397 F.3d at 973 ("The Court is not of one mind on the existence of a common law privilege. . . . However, all believe that if there is any such privilege, it is not absolute and may be overcome by an appropriate showing.").[25]

The Second Circuit, in addition to recognizing a qualified reporter's privilege arising under the First Amendment, as set forth above, has suggested that such a privilege may also be "rooted in federal common law," *Gonzales,* 194 F.3d at 35 n. 6, and several of the courts of this district have proceeded on an assumption that a qualified reporter's privilege exists on just such a basis. *See, e.g., Pugh v. Avis Rent A Car Sys.,* No. M8–85, 1997 WL 669876, at *3 (S.D.N.Y. Oct.28, 1997) (noting that "[u]nder federal common law journalists possess a qualified privilege not to disclose information prepared or obtained in connection with a news story . . .") (citing *Burke,* 700 F.2d at 76–78); *In re Application of Waldholz,* No. 87 Civ. 4296(KMW), 1996 WL 389261, at *2 (S.D.N.Y. July 11, 1996) (stating that, "[u]nder federal common law, journalists enjoy a qualified, but not an absolute, privilege with respect to information gathered in connection with the publication of an article.") (citing, *inter alia, Burke,* 700 F.2d at 76–78). Until now, however, no court in this district appears to have conducted an extended analysis of the existence of a reporter's privilege as to confidential sources under the analytic structure established by *Jaffee.*[26] *But cf. In re Application of Dow Jones & Co.,* 1998 WL 883299, at *4–6 (acknowledging the "teaching" of *Jaffee* as concerns Rule 501 but declining to recognize a federal common law reporter's privilege with respect to nonconfidential material).

---

25. *See also In re Grand Jury Subpoena, Judith Miller,* 397 F.3d at 989–96 (Tatel, C.J., concurring in the judgment) (applying a *Jaffee* analysis and concluding that a qualified reporter's privilege exists under the federal common law).

26. Those courts of this circuit to have recognized a qualified federal common law reporter's privilege, including in *Pugh* and *In re Application of Waldholz,* have typically done

so based upon the First Amendment jurisprudence of the Second Circuit and of the Supreme Court. As demonstrated by the application of the *Jaffee* factors here, the First Amendment caselaw of this and other circuits, while highly relevant to determining whether a federal common law privilege should be recognized under Rule 501, need not provide the sole basis for such recognition.

Turning, therefore, to the first factor identified in *Jaffee,* it is concluded here upon the record set forth above that the recognition of a reporter's privilege would serve significant private interests by permitting investigative reporters to continue to secure information from confidential sources with greater assurance that they would not be compelled to reveal the information obtained or the source of that information or run the risk of court-imposed sanctions, either option posing a threat to the reporters' ability to obtain confidential information in the future or to publish investigative stories at all. As the facts set forth above establish, disclosure of the identity of confidential sources would greatly hinder reporters' ability to gather and report news in the future.

In particular, both Miller and Shenon have testified that without information they have obtained in the past on condition that the identity of their sources would be kept in confidence, neither journalist would have been able to report on a wide range of issues of national significance, such as the threat posed by international terrorists, the prospect of germ warfare, efforts to reorganize the United States' intelligence agencies and plans to expand law enforcement's powers to conduct surveillance. Furthermore, Shenon has suggested that, in the absence of the protection afforded by a recognized privilege,

> Reporters and editors might eliminate information obtained from confidential sources from news reports if publication might result in subpoenas to themselves or their telephone companies. On some sensitive topics, the only available sources of information are confidential

sources; the press might simply avoid reporting on these topics altogether. (Shenon Aff. ¶ 14.)

In the context of a discussion of the reporter's privilege derived from the First Amendment, the Second Circuit has recognized similar "significant ... private interests" possessed by reporters. *See Baker,* 470 F.2d at 782 (explaining that "[c]ompelled disclosure of confidential sources unquestionably threatens a journalist's ability to secure information that is made available to him only on a confidential basis" and observing that "[t]he deterrent effect such disclosure is likely to have upon future 'undercover' investigative reporting ... threatens freedom of the press"); [27] *see also Gonzales,* 194 F.3d at 35 (noting the " 'the important interests of reporters ... in preserving the confidentiality of journalists' sources' ") (quoting *In re Petroleum Products,* 680 F.2d at 7); *United States v. Marcos,* No. SSSS 87 Cr. 598(JFK), 1990 WL 74521, at *2 (S.D.N.Y. June 1, 1990) ("[E]ffective gathering of newsworthy information in great measure relies upon the reporter's ability to secure the trust of news sources. Many doors will be closed to reporters who are viewed as investigative resources of litigants.").

Similar interests have been recognized by the Courts of Appeals of other circuits. *See, e.g., Cuthbertson,* 630 F.2d at 147 (affirming the availability of a qualified reporter's privilege under Rule 501 in the context of a criminal proceeding and noting a news organization's "interest in protecting confidential sources, preventing intrusion into the editorial process, and avoiding the possibility of self-censorship

---

**27.** The fact that the Second Circuit's discussion in *Baker* of the private interests served by recognizing a reporter's privilege came in the context of a First Amendment analysis is of no moment. As the Third Circuit has recognized in concluding that a qualified common law reporter's privilege exists under Rule 501,

"[w]here a witness claims a privilege founded on the First Amendment of the Constitution, our 'reason and experience' [in assessing the availability of a common law privilege under Rule 501] directs us in the first instance to that Amendment." *Riley,* 612 F.2d at 714.

created by compelled disclosure of sources and unpublished notes"); *see also La-Rouche Campaign*, 841 F.2d at 1181 (observing that the disclosure of confidential sources or information "would clearly jeopardize the ability of journalists and the media to gather information and, therefore, have a chilling effect on speech").

The second *Jaffee* factor to be weighed is whether the privilege would serve important public interests. Insofar as the full and unhampered reporting of the news depends, at least in part and for the reasons just stated, upon the ability of reporters to offer confidential protection to would-be sources, the reporter's privilege asserted by The Times does serve such interests. Although the reporting of Carl Bernstein and Bob Woodward, who exposed the Watergate scandal based in part on information obtained from a confidential source known only as "Deep Throat," is the most celebrated example of the use of information obtained from a confidential source to report on matters of public concern, further examples abound, from the revelation of information and photographs concerning the abuses at Abu Ghraib prison in Iraq, obtained by *The Washington Post* from confidential sources, *see* Scott Higham & Joe Stephens, *New Details of Prison Abuse Emerge; Abu Ghraib Detainees' Statements Describe Sexual Humiliation And Savage Beatings*, Wash. Post, May 21, 2004, at A1; *Today* (NBC television broadcast, May 21, 2004), to the numerous revelations cited in the affidavit of Jack Nelson, expert witness for The Times, including reports on the pardon of President Nixon, allegedly improper activities by administration officials during the Carter presidency, the Iran/Contra affair, and the Monica Lewinsky scandal, all made possible through the use of confidential sources. (*See* Jack Nelson Aff. ¶ 5.) News reports based upon information obtained from confidential sources have sparked investigations into organized crime, *see* Carl C. Monk, *Evidentiary Privilege for Journalists' Sources: Theory and Statutory Protection*, 51 Mo. L. Rev 1, 13 (1986), environmental and safety hazards related to nuclear power plants, and financial misconduct by elected officials, *see* Committee on Communications & Media Law, Association of the Bar of the City of New York, *The Federal Common Law of Journalists' Privilege: A Position Paper*, at 15–16 (2004), *available at* http://www.abcny.org/ (last visited Feb. 22, 2005) (*"Position Paper"*), to cite only a few additional examples of issues of indisputable public concern.[28] Similarly, be-

---

**28.** Although the examples cited here may suggest that the reliance by reporters on confidential sources is a relatively new phenomenon, the journalistic ethic of preserving the identity of a confidential source reaches back to the colonial period, when Benjamin Franklin's older brother James refused to disclose the identity of the author of a story published in his newspaper to a committee of the legislature and was jailed for a month as a result. *See* Paul Marcus, *The Reporter's Privilege: An Analysis of the Common Law, Branzburg v. Hayes, and Recent Statutory Developments*, 25 Ariz. L.Rev. 815, 817 (1984). In 1812, an editor for *The Alexandria Herald* refused to identify the sources of a news story and received a contempt citation from Congress. *See* Peri Z. Hansen, Comment, *"According to an Unnamed Official": Reconsidering the Consequences of Confidential Source Agreements When Promises Are Broken by the Press*, 20 Pepp. L.Rev. 115, 125 (1992). The earliest reported case in the courts did not occur until 1848, when a reporter was jailed for contempt of the Senate upon refusing to disclose who had given him a copy of a secret draft of a proposed treaty to end the Mexican–American War. *See Ex parte Nugent*, 18 F. Cas. 471 (C.C.D.C.1848) (No. 10,375). In 1857, a correspondent for The Times was imprisoned when he refused to reveal to a select committee of the House the identities of the House members who had told him that some of their colleagues were taking bribes. *See* 23 Charles Alan Wright & Kenneth W. Graham, Jr., *Federal Practice & Procedure: Evidence* § 5426 at 715 (1980 & Supp.2004). The issue of reporters preserving the confidentiality of their sources came to the forefront again dur-

tween September 24, 2001 and December 31, 2001, Shenon and Miller wrote seventy-eight articles for The Times on topics ranging from continued threats from Al Qaeda to the government's preparedness for the attacks of September 11, 2001, and from the investigation of the anthrax attacks in the months following September 11, 2001 to the government's investigation of GRF and HLF,[29] dozens of which articles likewise contain information attributed to confidential sources.

The public interests served by permitting reporters to keep in confidence the identity of their sources and information obtained from those sources have been acknowledged repeatedly by the courts of this circuit. *See, e.g., Gonzales,* 194 F.3d at 35 (observing that the journalist's privilege is designed to " 'protect the important interests of reporters and the public in preserving the confidentiality of journalists' sources' " and to protect the " 'pivotal function of reporters to collect information for public dissemination' ") (citations omitted); *Burke,* 700 F.2d at 77 (noting the "important social interests in the free flow of information" and stating that "[r]eporters are to be encouraged to investigate and expose, free from unnecessary government intrusion, evidence of criminal wrongdoing"); *Baker,* 470 F.2d at 782 (recognizing the "paramount public interest in the maintenance of a vigorous, aggressive and independent press capable of participating in robust, unfettered debate over controversial matters"). The courts of other circuits have similarly acknowledged the public interest fostered by an unfettered press. *See, e.g., Zerilli v. Smith,* 656 F.2d 705, 710–11 (D.C.Cir.1981) (noting that "news gathering is essential to a free press" and that "the press' function as a vital source of information is weakened whenever the ability of journalists to gather news is impaired") (quoting *New York Times,* 403 U.S. at 717, 91 S.Ct. 2140 (Black, J., concurring)) (quotation marks omitted); *Riley,* 612 F.2d at 714 (acknowledging "the essential role played by the press in the dissemination of information and matters of interest and concern to the public" and commenting that "[t]he interrelationship between newsgathering, news dissemination and the need for a journalist to protect his or her source is too apparent to require belaboring").

As the Supreme Court itself has noted, "[w]ithout the information provided by the press most of us and many of our representatives would be unable to vote intelligently or to register opinions on the administration of government generally." *Cox Broadcasting,* 420 U.S. at 492, 95 S.Ct. 1029; *see also New York Times,* 403 U.S. at 717, 91 S.Ct. 2140 (Black, J., concurring) ("The press was protected so that it could bare the secrets of government and inform the people."); *Time, Inc. v. Hill,* 385 U.S. 374, 389, 87 S.Ct. 534, 17 L.Ed.2d 456 (1967) (observing that a

ing the Depression, when the publication of stories on municipal corruption and labor unrest brought reporters to the witness stand, and prompted several states to adopt statutory protections for reporters. *See id.* at 715, 717–18 & n. 31. More recently, the 1969 trial of the "Chicago 7" and investigations of other anti-war activities during the Viet Nam war gave rise to renewed attention to confidential sources in the years preceding the Watergate scandal. *See id.* at 735–37.

**29.** The Seventh Circuit has confirmed the substantial accuracy of the reports related to GRF when it affirmed the dismissal of the defamation action brought by GRF arising out of certain of the articles at issue here as well as other reports of a similar nature. *See Global Relief Found., Inc. v. New York Times Co.,* 390 F.3d 973, 990 (7th Cir.2004) ("Whether the government was justified in its investigation or correct in its ultimate conclusion is irrelevant to a suit against news media defendants for accurately reporting on the government's probe.").

broadly defined freedom of the press "assures the maintenance of our political system and an open society"); *Estes v. Texas,* 381 U.S. 532, 539, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965) (recognizing that "[t]he free press has been a mighty catalyst in awakening public interest in governmental affairs, exposing corruption among public officers and employees and generally informing the citizenry of public events and occurrences, including court proceedings"); *Garrison v. Louisiana,* 379 U.S. 64, 77, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964) (noting the "the paramount public interest in a free flow of information to the people concerning public officials, their servants").[30] The public ends achieved through recognition of a reporter's privilege are, thus, vital to our democracy and of "transcendent importance." *Jaffee,* 518 U.S. at 11, 116 S.Ct. 1923.

The third *Jaffee* factor to be considered is whether the significant private and public interests that would be served by recognition of the privilege proposed outweigh any evidentiary benefit that would result from rejection of that privilege. In weighing the effect of the denial of a psychotherapist-patient privilege in *Jaffee,* the Court concluded that the evidentiary benefit that would result from such a denial was modest. As the Court explained,

If the privilege were rejected, confidential conversations between psychotherapists and their patients would surely be chilled, particularly when it is obvious that the circumstances that give rise to the need for treatment will probably result in litigation. Without a privilege, much of the desirable evidence to which litigants such as petitioner seek access—

for example, admissions against interest by a party—is unlikely to come into being. This unspoken "evidence" will therefore serve no greater truth-seeking function than if it had been spoken and privileged.

*Jaffee,* 518 U.S. at 11–12, 116 S.Ct. 1923. A similar logic applies here. In the absence of recognition of the reporter's privilege advocated by The Times, the government stands to enjoy an evidentiary benefit in this particular case. More generally, however, the record here has established, and the reason and experience of the numerous courts and state legislatures which have recognized or adopted protections for reporters vis-a-vis confidential sources[31] affirm, that in the absence of a recognized privilege fewer sources will provide information of a sensitive nature to reporters where doing so places them at risk of losing their job or otherwise incurring some penalty should they be identified. *See also Zerilli,* 656 F.2d at 711–12 ("[C]onfidentiality is often essential to establishing a relationship with an informant.... Unless potential source are confident that compelled disclosure is unlikely, they will be reluctant to disclose any confidential information to reporters."); *Miller v. Transamerican Press Inc.,* 621 F.2d 721, 725 (5th Cir. 1980) ("[F]orced disclosure of journalists' sources might deter informants from giving their stories to newsmen, except anonymously. This might cause the press to face the unwelcome alternatives of not publishing because of the inherent unreliability of anonymous tips, or publishing

---

**30.** The DOJ's own Guidelines explicitly recognize the public interests served by an unfettered press. The Guidelines acknowledge that the public possesses an "interest in the free dissemination of ideas and information," that "freedom of the press can be no broader than the freedom of reporters to investigate and report the news" and that the DOJ's intent in promulgating the Guidelines is "to protect freedom of the press, news gathering functions, and news media sources...." 28 C.F.R. § 50.10.

**31.** *See infra* notes 34–38.

anonymous tips and becoming vulnerable to charges of recklessness.").[32]

Reason dictates here, as in *Jaffee*, that the likelihood that whistle-blowing or other provision of sensitive information would decrease were the reporter's privilege unequivocally rejected by this and other courts is particularly strong where it is obvious that the circumstances that give rise to the revelation of any such sensitive information are likely to result in litigation or, as here, a governmental investigation. Moreover, as was the case in *Jaffee*, were the existence of the reporter's privilege denied, the very transfer of information from would-be confidential sources to reporters would be less likely, if not, as the *Jaffee* Court concluded, "unlikely," to occur at all, rendering the probable evidentiary benefit from the denial of the privilege modest at best when viewed, per *Jaffee*, outside the confines of the particular case at hand.

The balance of the private and public interests that would be served by the asserted privilege, when weighed against the modest evidentiary benefit that rejection of the privilege would likely achieve, demonstrates that the recognition of a reporter's privilege under Rule 501 is appropriate here. Contrary to The Times' suggestion, however, this privilege is no more absolute than the privilege arising from the First Amendment discussed above. While this Court is mindful of the view expressed in *Jaffee* that "the participants in ... confidential conversation[s] 'must be able to predict with some degree of certainty whether particular discussions will be protected,' " and that " '[a]n uncertain privilege, or one which purports to be certain but results in widely varying applications by the courts, is little better than no privilege at all,' " *Jaffee*, 518 U.S. at 17–18, 116 S.Ct. 1923 (quoting *Upjohn Co. v. United States*, 449 U.S. 383, 393, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981)), those federal courts to have recognized a common law reporter's privilege as such have uniformly concluded that an absolute privilege is not appropriate, *see, e.g., Cuthbertson*, 630 F.2d at 146–48; *Riley*, 612 F.2d at 715; *Foote*, 2002 WL 1822407, at *2; *McCarty*, 195 F.R.D. at 44; *Cinel*, 792 F.Supp. at 499; *cf. In re Grand Jury Subpoena, Judith Miller*, 397 F.3d at 965–66 (reaching no decision as to the existence of a common law reporter's privilege, but holding that if such a privilege exists, "it is not absolute"), as have those courts of this circuit and elsewhere which have recognized a First Amendment reporter's privilege, as documented above. In view of the unanimity of judicial reason and experience in this regard, the desirability of congruence between the First Amendment privilege recognized in this circuit and the federal common law privilege recognized here, and the predictability of circumstances in which the public interests served by the reporter's privilege might be overshadowed by other, more compelling public interests,[33] no basis is found here to recognize anything more than a qualified privilege.

---

**32.** In the words of Judge Tatel,

If litigants and investigators could easily discover journalists' sources, the press's truth-seeking function would be severely impaired. Reporters could reprint government statements, but not ferret out underlying disagreements among officials; they could cover public governmental actions, but would have great difficulty getting potential whistleblowers to talk about government misdeeds; they could report arrest statistics, but not garner first-hand information about the criminal underworld. Such valuable endeavors would be all but impossible, for just as mental patients who fear "embarrassment or disgrace," [*Jaffee*, 518 U.S. at 10, 116 S.Ct. 1923], will "surely be chilled" in seeking therapy, *id.* at 12, 116 S.Ct. 1923, so will sources who fear identification avoid revealing information that could get them in trouble.

*In re Grand Jury Subpoena, Judith Miller*, 397 F.3d at 996 (Tatel, C.J., concurring in the judgment).

**33.** As Judge Tatel has recently observed, while leaks of confidential information to a

This recognition of a qualified reporter's privilege with respect to confidential sources is consonant with the conclusions reached by the courts or legislatures of forty-eight states as well as the District of Columbia on the issue of a reporter's privilege against compelled disclosure, a fact of some significance under *Jaffee*. "Shield laws," by which reporters have been afforded varying degrees of protection against compelled disclosure of, *inter alia*, confidential sources, have been adopted in thirty-one states, including Alabama, Alaska, Arizona, Arkansas, California, Colorado, Delaware, Florida, Georgia, Illinois, Indiana, Kentucky, Louisiana, Maryland, Michigan, Minnesota, Montana, Nebraska, Nevada, New Jersey, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina and Tennessee, as well as the District of Columbia,[34] and California's Constitution was amended in 1980 to add specific protections for reporters.[35] Judicial decisions in several of these same states, including Florida, Louisiana, Michigan, New York and Oklahoma, have also interpreted either the federal or state constitutions as giving rise to a qualified reporter's privilege.[36]

reporter may lead to the publication of information of great value, they may also result in death, injury or affect national security interests, "causing harm far in excess of their news value." *In re Grand Jury Subpoena, Judith Miller*, 2005 WL 350745, at *30 (Tatel, C.J., concurring in judgment).
In such cases, the reporter privilege must give way. Just as attorney-client communications "made for the purpose of getting advice for the commission of a fraud or crime" serve no public interest and receive no privilege, *see United States v. Zolin*, 491 U.S. 554, 563, 109 S.Ct. 2619, 105 L.Ed.2d 469 (1989) (internal quotation marks omitted), neither should courts protect sources whose leaks harm national security while providing minimal benefit to public debate. *Id.* (Tatel, C.J., concurring in judgment).

34. *See* Ala.Code § 12–21–142; Alaska Stat. § 09.25.300 *et seq.*; Ariz.Rev.Stat. §§ 12–2214, 12–2237; Ark.Code Ann. § 16–85–510; Cal. Evid.Code § 1070; Colo.Rev.Stat. §§ 13–90–119, 24–72.5–101 *et seq.*; Del.Code Ann. tit. 10, § 4320 *et seq.*; D.C.Code Ann. § 16–4701 *et seq.*; Fla. Stat. Ann. § 90.5015; Ga. Code Ann. § 24–9–30; 735 Ill. Comp. Stat. Ann. § 5/8–901 *et seq.*; Ind.Code Ann. § 34–46–4–1 *et seq.*; Ky.Rev.Stat. Ann. § 421.100; La.Rev.Stat. Ann. § 45:1451 *et seq.*; Md. Code. Ann., Cts. & Jud. Proc. § 9–112; Mich. Compl. Laws Ann. §§ 767.5a, 767A.6; Minn. Stat. Ann. § 595.021 *et seq.*; Mont.Code Ann. § 26–1–902 *et seq.*; Neb.Rev.Stat. § 20–144 *et seq.*; Nev.Rev.Stat. Ann. §§ 49.275, 49.385; N.J. Stat. Ann. §§ 2A:84A–21.1 *et seq.*, 2A:84A–29; N.Y. Civ. Rights Law § 79–h; N.C. Gen.Stat. § 8–53.11; N.D. Cent.Code § 31–01–06.2; Ohio Rev.Code Ann. §§ 2739.04, 2739.12; Okla. Stat. Ann. tit. 12, § 2506; Or.Rev.Stat. § 44.510 *et seq.*; 42 Pa. Cons.Stat. Ann. § 5942; R.I. Gen. Laws § 9–19.1–1 *et seq.*; S.C.Code Ann. § 19–11–100; Tenn.Code Ann. § 24–1–208. A shield law adopted in New Mexico in 1973, presently codified at N.M. Stat. Ann. § 38–6–7, was held to be an invalid exercise of legislative power by the state's highest court, *see Ammerman v. Hubbard Broadcasting, Inc.*, 89 N.M. 307, 551 P.2d 1354, 1358–59 (1976), which subsequently created a rule of evidence embodying just such a privilege. *See* N.M.R. Evid. 11–514; *see generally* Daniel M. Faber, Comment, *Coopting the Journalist's Privilege: Of Sources and Spray Paint*, 23 N.M.L.Rev. 435, 440 (1993) (describing the history of the reporter's privilege in New Mexico).

35. *See* Cal. Const., Art. I, § 2(b) (declaring that reporters could not be adjudged in contempt for refusing to disclose the source of any information). Although neither California's Constitution nor its shield law, *see* Cal. Evid.Code § 1070, refers specifically to a privilege *per se*, "[s]ince contempt is generally the only effective remedy against a non-party witness, the California enactments grant such witnesses virtually absolute protection against compelled disclosure." *Mitchell v. Superior Court*, 37 Cal.3d 268, 208 Cal.Rptr. 152, 690 P.2d 625, 628 (1984).

36. *See Morgan v. Florida*, 337 So.2d 951, 956 (Fla.1976) (recognizing a qualified reporter's privilege arising under the First Amendment

In fourteen of the remaining nineteen states, including Idaho, Iowa, Kansas, Maine, Massachusetts, Missouri, New Hampshire, South Dakota, Texas, Vermont, Virginia, Washington, West Virginia and Wisconsin, a reporter's privilege has been recognized by either the state's high-est court or an appeals court in civil or criminal proceedings, including, in several instances, grand jury proceedings.[37] In addition, lower courts in Connecticut, Mississippi and Utah have recognized a reporter's privilege in both civil and criminal contexts.[38] Of the two remaining states,

to the U.S. Constitution against the forced revelation of sources); *In re Grand Jury Proceedings (Ridenhour)*, 520 So.2d 372, 376 (La. 1988) (recognizing a qualified privilege arising under the federal constitution against forced testimony before a grand jury); *In re Deposition of Photo Mktg. Ass'n Int'l*, 120 Mich.App. 527, 327 N.W.2d 515, 517–18 (1982) (recognizing a qualified privilege arising under the First Amendment); *O'Neill v. Oakgrove Constr., Inc.*, 71 N.Y.2d 521, 528 N.Y.S.2d 1, 523 N.E.2d 277, 277–78 (1988) (recognizing a qualified privilege arising under the federal and the state constitutions for non-confidential materials); *Taylor v. Miskovsky*, 640 P.2d 959, 961–62 (Okla.1981) (recognizing a qualified First Amendment privilege and concluding that the privilege was embodied in the state's shield law). *But see In re WTHR–TV*, 693 N.E.2d 1, 13 (Ind.1998) (rejecting arguments for a qualified reporter's privilege arising under the federal constitution related to non-confidential materials); *Vaughn v. Georgia*, 259 Ga. 325, 381 S.E.2d 30, 31 (1989) (concluding that the Georgia Constitution offers no protection to reporters from compelled disclosure of confidential sources).

**37.** *See, e.g., Idaho v. Salsbury*, 129 Idaho 307, 924 P.2d 208, 213 (1996) (criminal); *In re Wright*, 108 Idaho 418, 700 P.2d 40, 41 (1985) (criminal); *Winegard v. Oxberger*, 258 N.W.2d 847, 850 (Iowa 1977) (civil); *Kansas v. Sandstrom*, 224 Kan. 573, 581 P.2d 812, 814–15 (1978) (criminal); *In re Letellier*, 578 A.2d 722, 726–27 (Me.1990) (grand jury); *In re John Doe Grand Jury Investigation*, 410 Mass. 596, 574 N.E.2d 373, 375 (1991) (grand jury); *Sinnott v. Boston Retirement Bd.*, 402 Mass. 581, 524 N.E.2d 100 (1988) (civil); *Ayash v. Dana–Farber Cancer Inst.*, 46 Mass.App.Ct. 384, 706 N.E.2d 316, 319 (1999) (civil); *Missouri ex rel. Classic III, Inc. v. Ely*, 954 S.W.2d 650, 654–55 (Mo.Ct.App.1997) (civil); *New Hampshire v. Siel*, 122 N.H. 254, 444 A.2d 499, 502–03 (1982) (criminal); *Opinion of the Justices*, 117 N.H. 386, 373 A.2d 644, 647 (1977) (civil statutory proceeding); *Hopewell v. Midcontinent Broadcasting Corp.*, 538

N.W.2d 780, 781–82 (S.D.1995) (civil); *Dallas Morning News Co. v. Garcia*, 822 S.W.2d 675, 678 (Tex.App.1991) (civil); *Vermont v. St. Peter*, 132 Vt. 266, 315 A.2d 254, 256 (1974) (criminal); *Brown v. Virginia*, 214 Va. 755, 204 S.E.2d 429, 431 (1974) (criminal); *Clemente v. Clemente*, 56 Va. Cir. 530, 530 (Va. Cir.2001) (civil); *Clampitt v. Thurston County.*, 98 Wash.2d 638, 658 P.2d 641, 642 (1983) (civil); *Senear v. Daily Journal–American*, 97 Wash.2d 148, 641 P.2d 1180, 1181, 1183 (1982) (civil); *Washington v. Rinaldo*, 36 Wash.App. 86, 673 P.2d 614 (1983) (criminal), *aff'd on other grounds*, 102 Wash.2d 749, 689 P.2d 392 (1984); *West Virginia ex rel. Charleston Mail Ass'n v. Ranson*, 200 W.Va. 5, 488 S.E.2d 5, 10–11 (1997) (criminal); *West Virginia ex rel. Hudok v. Henry*, 182 W.Va. 500, 389 S.E.2d 188, 192–93 (1989) (civil); *Zelenka v. Wisconsin*, 83 Wis.2d 601, 266 N.W.2d 279, 287 (1978) (criminal); *Kurzynski v. Milwaukee Magazine*, 196 Wis.2d 182, 538 N.W.2d 554, 557–58 (1995) (civil); *Wisconsin v. Knops*, 49 Wis.2d 647, 183 N.W.2d 93, 99 (1971) (grand jury).

**38.** *See Connecticut State Bd. of Labor Relations v. Fagin*, 33 Conn.Supp. 204, 370 A.2d 1095, 1097–98 (1976) (civil); *Pope v. Village Apartments, Ltd.*, No. 92–71–436 CV (Miss. 1st Cir.Ct. Jan. 23, 1995) (unpublished opinion) (civil); *In re Grand Jury Subpoena*, No. 38,664 (Miss.2d Cir.Ct. Oct. 4, 1989) (unpublished opinion) (grand jury); *Mississippi v. Hand*, No. CR89–49–C (T–2) (Miss. 1st Cir.Ct. July 31, 1990) (unpublished opinion) (grand jury); *Lester v. Draper*, No. 000906048 (Utah 3d Dist.Ct. Jan. 16, 2002) (unpublished opinion) (civil); *Utah v. Koolmo*, No. 981905396 (Utah 3d Dist.Ct. Mar. 29, 1999) (unpublished opinion) (criminal). *See also* Edward L. Carter, Note, *Reporter's Privilege in Utah*, 18 B.Y.U. J. Pub.L. 163, 174–79 (2003) (describing six Utah trial court decisions recognizing a qualified reporter's privilege, four of which involved subpoenas from prosecutors); The Reporters Committee for Freedom of the Press, *The Reporter's Privilege Compendium* (2002),

the courts and legislature of Wyoming have remained silent on the issue,[39] as have those of Hawaii since *Branzburg* was issued.[40]

As the *Jaffee* court observed with respect to a psychotherapist-patient privilege, "the existence of a consensus among the States indicates that 'reason and experience' support recognition of the privilege," *Jaffee*, 518 U.S. at 13, 116 S.Ct. 1923, and the near unanimous consensus of the states as to the importance of offering qualified, and in some cases absolute, protection to reporters with respect to confidential sources leads to the same conclusion here. Furthermore, while the adoption in New York of an absolute protection concerning information obtained or received in confidence [41] does not compel the recognition of a similarly absolute rule here, the fact that New York as well as Illinois [42] (the location of the grand jury at issue here) are among those states to have adopted statutory protections for reporters with respect to confidential sources is particularly relevant to the determination of whether such a protection should be recognized here. *See Baker,* 470 F.2d at 782 (noting that, "while not conclusive in an action of this kind" where a federal question is at issue, the shield laws of New York and Illinois were relevant in determining whether a journalist based in New York should be compelled to disclose confidential news sources in connection with a civil rights action pending in the Northern District of Illinois).[43] This relevance

---

available at http://www.rcfp.org/-privilege/index.html (last visited Feb. 22, 2005) (collecting additional unpublished trial court orders from Mississippi recognizing a qualified privilege under Fifth Circuit jurisprudence).

**39.** *See generally* The Reporters Committee for Freedom of the Press, *The Reporter's Privilege Compendium* (2002), *available at* http://www.rcfp.org/privilege/index.html (last visited Feb. 22, 2005) (noting that anecdotal evidence suggests that few subpoenas have been issued to news organizations or reporters in Wyoming and that those few subpoenas issued usually ask the reporter to testify that his or her story was accurate).

**40.** *Compare Appeal of Goodfader,* 45 Haw. 317, 367 P.2d 472, 480–83 (1961) (declining to recognize an evidentiary reporter's privilege where no statutory authority for such a privilege existed and noting that "[w]e have not been convinced that there is a First Amendment protection available"), *with De-Roburt v. Gannett Co.,* 507 F.Supp. 880, 883 (D.Haw.1981) (recognizing a qualified reporter's privilege derived from the First Amendment to the U.S. Constitution).

**41.** *See* N.Y. Civ. Rights Law § 79–h; *see also Beach v. Shanley,* 62 N.Y.2d 241, 476 N.Y.S.2d 765, 465 N.E.2d 304, 306 (1984) ("In enacting the so-called 'Shield Law,' the Legislature expressed a policy according reporters strong protection against compulsory disclosure of their sources or information ob-

tained in the news-gathering process. As the statute is framed, the protection is afforded notwithstanding that the information concerns criminal activity and, indeed, even when revealing the information to the reporter might itself be a criminal act.").

**42.** The Illinois shield law provides a qualified privilege. *See* 735 Ill. Comp. Stat. Ann. § 5/8–901 *et seq.; see also In re Special Grand Jury Investigation of Alleged Violation of the Juvenile Court Act,* 104 Ill.2d 419, 84 Ill.Dec. 490, 472 N.E.2d 450, 453–54 (1984) (explaining that the Illinois shield law's provisions "reflect a clear legislative intent to create a standard which balances the reporter's first amendment rights against the public interest in the information sought and the practical difficulties in obtaining the information elsewhere" and concluding that "the proof of exhaustion of alternative sources here was insufficient to justify divestiture of the reporter's privilege" in the context of a grand jury proceeding).

**43.** *See also von Bulow,* 811 F.2d at 144 (noting that, in federal question cases, courts should not "ignore New York's policy of giving protection to professional journalists" under New York's shield law); *In re Application of Behar,* 779 F.Supp. 273, 274 (S.D.N.Y. 1991) (observing that it is appropriate for courts in federal question cases to take New York's shield law into account and that New York courts have deemed the "underlying pol-

stems from recognition of the fact that, were the privilege advocated here rejected, the degree to which confidential sources could be protected would be rendered uncertain, thereby lessening the likelihood that such sources will cooperate and undercutting the very benefit to the public that New York, like so many other states, sought to bestow through its shield law. Thus, here, as in *Jaffee*, denial of the privilege "would frustrate the purposes of the state legislation that was enacted to foster these confidential communications." *Jaffee*, 518 U.S. at 13, 116 S.Ct. 1923 (noting, with respect to the psychotherapist-patient privilege, that "any State's promise of confidentiality would have little value if the patient were aware that the privilege would not be honored in a federal court") (footnote omitted).

In *Jaffee*, the Supreme Court derived further support for the conclusion that a psychotherapist-patient privilege ought to be recognized from the fact that such a privilege had been among those privileges initially proposed to Congress prior to the adoption of Rule 501. *See Jaffee*, 518 U.S. at 14–15, 116 S.Ct. 1923. Although, unlike the psychotherapist-patient privilege, no reporter's privilege was included among those privileges initially proposed some thirty years ago, this fact is not dispositive, *see Gillock*, 445 U.S. at 367–68, 100 S.Ct. 1185 (noting that the fact that a particular privilege was not proposed, while relevant, "standing alone would not compel the federal courts to refuse to recognize a privilege omitted from the proposal"), particularly given that the version of Rule 501 eventually adopted was intended to allow for the evolution of the common law and the development of new privileges as a

result. *See, e.g., Jaffee*, 518 U.S. at 9, 116 S.Ct. 1923; *Trammel*, 445 U.S. at 47, 100 S.Ct. 906.

Indeed, as the Third Circuit explained in *Riley v. City of Chester*, 612 F.2d 708 (3d Cir.1979), the absence of a reporter's privilege among the specific privileges initially proposed to Congress was, at least in part, responsible for the rejection of that proposal in favor of the more flexible approach eventually adopted:

The original draft of the Rule defined nine specific nonconstitutional privileges, but failed to include among the enumerated privileges one for a reporter or journalist. The Advisory Committee gave no reason for the omission. This was one of the primary focuses of the congressional review of the proposed evidentiary rules, stemming in part from the nationwide discussions of the newspaperman's privilege. Following testimony on behalf of groups such as the Reporters Committee for Freedom of the Press, the privilege rule was revised to eliminate the proposed specific rules on privileges and to leave the law of privilege in its current state to be developed by the federal courts.

*Riley*, 612 F.2d at 714 (internal footnotes and quotation marks omitted); *see also* 120 Cong. Rec. H12,254 (1974) (quoting Congressman Hungate, Chairman of the House Judiciary Subcommittee on Criminal Justice and principal draftsman of Rule 501, as noting in his presentation of the Conference Report to the House that Rule 501 was "not intended to freeze [the] law of privileges as it now exists" and that the language of the Rule "permits the courts to develop a privilege for newspaper peo-

icies" with respect to the shield law and the First Amendment privilege at issue "congruent"); *Gulliver's Periodicals*, 455 F.Supp. at 1200 (looking to Illinois' shield law in a federal question case on the ground that,

where "there is no controlling federal statute on the asserted privilege, the district court for its guidance may consider existing state law concerning the privilege").

ple on a case-by-case basis"); *Position Paper,* at 2 (observing that "Congress rejected the draft rules defining certain specific privileges because they would limit the flexibility of the courts, drew privilege lines too rigidly and too narrowly, and, the legislative history shows, because certain privileges were left out, including the journalists' privilege"). Accordingly, the fact that a reporter's privilege was not among those privileges initially proposed to Congress several decades ago affords little basis upon which to conclude that recognition of a common law reporter's privilege today, in light of the near unanimity of the state courts and legislatures and the jurisprudence of this circuit, would be inappropriate.

The government has contended that it would be inappropriate for this Court to conclude that a common law reporter's privilege exists, as the Supreme Court has already expressly declined to recognize such a privilege in *Branzburg. See Branzburg,* 408 U.S. at 685–91, 92 S.Ct. 2646. In the first place, the question of whether the federal common law had recognized or should recognize a reporter's privilege was not before the Court in *Branzburg. See Position Paper* at 11–12 & n. 4 (noting that the questions presented in all of the cases decided collectively in *Branzburg* involved the First Amendment rather than federal common law and that, in any event, the application of the federal common law was irrelevant to those consolidated cases which were on writ of certiorari to state courts "where the issue of the scope of the privilege under federal common law could not even have arisen"); *see also In re Grand Jury Subpoena, Judith Miller,* 397 F.3d at 983 (Henderson, C.J., concurring) (concluding that *Branzburg* addressed only First Amendment questions and that, as the "boundaries of constitutional law and common law do not necessarily coincide ... we are not bound by *Branzburg*'s commentary on the state of the common

law in 1972"); *accord id.* at 994 (Tatel, C.J., concurring in judgment) (noting that the issue in *Branzburg* concerned the existence of a First Amendment privilege and stating that *"Branzburg*'s holding hardly forecloses the common law argument presented here"). Indeed,

> *Branzburg* acknowledged that "Congress has freedom to determine whether a statutory newsman's privilege is necessary and desirable and to fashion standards and rules as narrow or broad as deemed necessary to deal with the evil discerned," 408 U.S. at 706, 92 S.Ct. 2646, a power Congress delegated to the federal courts through Rule 501.

*Id.* at 994 (Tatel, C.J., concurring in judgment).

Furthermore, the *Branzburg* Court's observations concerning the historic refusal of various state and federal courts to recognize a reporter's privileges in the context of a grand jury investigation do not preclude this Court from finding a federal common law privilege to have developed in the decades since *Branzburg* was issued. To conclude otherwise would be contrary to the mandate of Rule 501 and the congressional intent underlying that Rule "not to freeze the law of privilege," *Trammel,* 445 U.S. at 47, 100 S.Ct. 906; *but cf. In re Grand Jury Proceedings,* 5 F.3d at 403 n. 3 (discerning "nothing in the text of Rule 501 ... that sanctions the creation of privileges by federal courts in contradiction of the Supreme Court's mandate"), and would disregard the significant number of states whose courts and legislatures have recognized a reporter's privilege since 1972. *Compare supra* notes 34–38 (collecting cases and statutes from forty-eight states and the District of Columbia recognizing a reporter's privilege), *with Branzburg,* 408 U.S. at 689 & n. 27, 92 S.Ct. 2646 (noting that only seventeen states had provided some type of statutory protection to reporters with respect to confidential sources). For the same reason, the gov-

ernment's argument that the application of a *Jaffee*-based analysis is inappropriate where the Supreme Court has already expressed its view of the appropriate balancing of societal interests in light of its assessment of the then-applicable state of the common law and on the record presented in that case must be rejected. *But see In re Special Counsel Investigation,* 338 F.Supp.2d at 18–19 (concluding that no federal common law reporter's privilege may be recognized under Rule 501 due to the *Branzburg* Court's prior balancing of the relevant competing societal interests in the First Amendment context).

Nor is this Court bound by the *Branzburg* Court's conclusion that "[t]he evidence fails to demonstrate that there would be a significant constriction of the flow of news to the public" if a reporter's privilege were not recognized, as the Court's determination in *Branzburg* was expressly based upon the "available data" and "the records before" the Court at that time. *Branzburg,* 408 U.S. at 693, 92 S.Ct. 2646. Here, the record, which includes the affidavits of Miller and Shenon as well as four other individuals, indicates the danger that would result if a reporter's privilege is not recognized and the considerable jurisprudence and legislative enactments cited above demonstrate widespread acknowledgment of this same danger.

Insofar as the government has argued, following *Branzburg,* that empirical evidence is required to demonstrate the effect that denial of the reporter's privilege would have, such a requirement does not necessarily survive *Jaffee,* where the Court relied largely on common sense and, without any reference to empirical data, the prospect that "the mere possibility of disclosure may impede development of the confidential relationship necessary for successful treatment" in concluding that a psychotherapist-patient privilege should be recognized under Rule 501. *Jaffee,* 518 U.S. at 10, 116 S.Ct. 1923; *see also Swidler & Berlin v. United States,* 524 U.S. 399, 409–10 & n. 4, 118 S.Ct. 2081, 141 L.Ed.2d 379 (1998) (recognizing the posthumous application of attorney-client privilege where there was scant evidence of the impact the recognition of such a privilege might have); *Trammel,* 445 U.S. at 44–45, 53, 100 S.Ct. 906 (allowing waiver by the testifying spouse without reference to particular studies supporting the conclusion reached and relying instead upon the common-sense notion that, "[w]hen one spouse is willing to testify against the other in a criminal proceeding—whatever the motivation—their relationship is almost certainly in disrepair").[44]

The fact that a federal shield law has not been enacted by Congress in the decades since *Branzburg* issued does not, as the government has argued, provide a clear indication that the recognition of such a privilege is unnecessary.[45] As the Supreme Court has recognized, the "signifi-

---

44. In any event, even if empirical evidence were required, the evidence concerning the importance of the protection of confidential sources has mounted since *Branzburg* was issued. *See, e.g.,* The Reporters Committee for Freedom of the Press, *Agents of Discovery: A Report on the Incidence of Subpoenas Served on the News Media in 2001* (2003), *available at* http://www.rcfp.org/agents/ (last visited Feb. 22, 2005); Laurence B. Alexander *et al., Branzburg v. Hayes Revisited: A Survey of Journalists Who Become Subpoena Targets,* 15 Newspaper Res. J. 83 (1994); Monica Lang-

ley & Lee Levine, *Branzburg Revisited: Confidential Sources and First Amendment Values,* 57 Geo. Washington L.Rev. 13 (1988); John E. Osborne, *The Reporter's Confidentiality Privilege: Updating the Empirical Evidence After a Decade of Subpoenas,* 17 Colum. Hum. Rts. L.Rev. 57 (1985).

45. Federal shield laws have been proposed on numerous occasions, most recently in February 2005. *See* 151 Cong. Rec. S1344–02, at S1344 (Feb. 14, 2005) (introducing S. 369); 151 Cong. Rec. S1199–02, at S1215 (Feb. 9, 2005) (introducing S. 340); 151 Cong. Rec.

cance of subsequent congressional action or inaction necessarily varies with the circumstances," *United States v. Wells*, 519 U.S. 482, 495, 117 S.Ct. 921, 137 L.Ed.2d 107 (1997), and the government has suggested no basis upon which it might be concluded that Congress' silence in this regard is particularly meaningful.

Nor does the adoption by the DOJ of the Guidelines concerning the issuance of subpoenas to members of the media and to third parties for telephone records of the media members obviate recognition of a common law privilege, as the government suggests. Although the *Branzburg* Court recognized that rules adopted by the Attorney General were "a major step in the direction the reporters herein desire to move" and "may prove wholly sufficient to resolve the bulk of disagreements and controversies between press and federal officials," *Branzburg*, 408 U.S. at 706–07, 92 S.Ct. 2646, the Guidelines are, as explained more fully above,[46] applicable only to the DOJ and not privately enforceable. As a result, whatever the Guidelines' possible success in reducing the number of subpoenas issued to members of the press by federal prosecutors, *see generally* 23 Charles Alan Wright & Kenneth W. Graham, *Federal Practice & Procedure: Evidence* § 5426 at 740 & n. 36 (1980 & Supp.2004), their "sufficien[cy]" as a means of resolving disputes between members of the press and federal officials is not universal, as demonstrated by the facts presented here.

Finally, the government has argued that a reporter's privilege should not be recognized under the federal common law because the precise contours of such a privilege would be difficult to fashion. Although the development of parameters concerning the application of a privilege under the federal common law will doubtless encounter certain interpretive hurdles, the possibility of interpretive disputes does not counsel against recognition of a qualified privilege at all, particularly where guidance may be derived from the ample body of legislation and jurisprudence of the states as well as from the First Amendment and federal common law caselaw of the federal courts. As the *Jaffee* Court emphasized, a rule, such as Rule 501, "that authorizes the recognition of new privileges on a case-by-case basis makes it appropriate to define the details of new privileges in a like manner." *Jaffee*, 518 U.S. at 18, 116 S.Ct. 1923.

▬ Accordingly, for the reasons stated, there is a qualified federal common law reporter's privilege with respect to the protection of confidential sources.

## C. The Government Has Not Overcome The Qualified Reporter's Privilege

### 1. Third Party Telephone Records Are Protected By The Qualified Reporter's Privilege

▬ The government argues that the qualified reporter's privilege, whether deriving from the First Amendment or arising under federal common law, does not extend to telephone records held by third-party telephone providers because such records "will not identify any confidential source ... but rather, at best, will supply leads which, with additional investigation, will enable the government to identify the source of the subject disclosure." (Gov.

H290–06, at H290 (Feb. 2, 2005) (introducing H.R. 581); *see also* Theodore Campagnolo, *The Conflict Between State Press Shield Laws and Federal Criminal Proceedings: The Rule 501 Blues*, 38 Gonz. L.Rev. 445, 470–72 (2002/2003) (describing the introduction in both the House and the Senate of a number of bills and resolutions aimed at creating a federal reporter's privilege following the announcement of *Branzburg* ).

**46.** *See supra* Part III.

Mem. Supp. Cross Mot. Summ. J. at 43–44.)

In support of this argument, the government relies heavily on a single decision from the District of Columbia Circuit. *See Reporters Committee for Freedom of the Press v. AT & T,* 593 F.2d 1030 (D.C.Cir. 1978). The *Reporters Committee* court considered, *inter alia,* whether journalists are "entitled under the First Amendment to prior notice of toll-call-record subpoenas issued in the course of felony investigations." *Id.* at 1046. Based on its view that *Branzburg* recognized no First Amendment privilege, the *Reporters Committee* court concluded that "the Government's good faith inspection of [a reporter's] telephone companies' toll call records does not infringe on plaintiffs' First Amendment rights, because that Amendment guarantees no freedom from such investigation." *Id.* at 1051–52.

Because the Second Circuit has interpreted *Branzburg* as recognizing a First Amendment qualified privilege, *Reporters Committee* is inapposite. Moreover, The Times' First Amendment interest in records held by third parties is well supported. *See, e.g., Local 1814, Int'l Longshoremen's Ass'n v. Waterfront Comm'n,* 667 F.2d 267, 271 (2d Cir.1981) (stating that "First Amendment rights are implicated whenever Government seeks from third parties records of actions that play an integral part in facilitating an association's normal arrangements for obtaining members or contributions"); *Food Lion, Inc. v. Capital Cities/ABC, Inc.,* No. 6:92CV00592, 1996 WL 575946, at *1–2

(M.D.N.C. Sept.6, 1996) (holding subpoenas directed to telecommunications companies and other third parties "clearly infringe[d] ABC's First Amendment rights with regard to its confidential sources"); *Pollard v. Roberts,* 283 F.Supp. 248, 259 (E.D.Ark.) (three judge court) (holding that the Arkansas Republican Party had a First Amendment interest in bank records that evidenced the identities of party contributors), *aff'd,* 393 U.S. 14, 89 S.Ct. 47, 21 L.Ed.2d 14 (1968).

Based on the foregoing, it is determined that the First Amendment interest at issue, *i.e.,* the protection of newsgathering that depends on information obtained from confidential sources, is the same whether the government compels testimony from The Times' reporters concerning the names of their confidential sources or instead compels production from third parties of records evidencing telephone communication between such reporters and their confidential sources. Therefore, the telephone records are protected by the qualified reporter's privilege.

■■■ In the alternative, the government has urged the court to take judicial notice of the fact that the subpoena at issue will have little, if any, impact on The Times' protected newsgathering activities.[47] The Court declines to take judicial notice of the government's position that compelled disclosure of telephone records revealing dozens of confidential sources would have no effect on newsgathering. Moreover, the government has not challenged the six detailed affidavits submitted by The Times to the contrary.[48]

---

**47.** The government states that "[t]he court may take judicial notice of the fact that it is widely known that records of telephone service providers are available to the government, and to date that common knowledge has had no apparent impact on the availability of source information, including informa-

tion delivered by telephone." (Gov. Mem. Supp. Cross–Mot. Summ. J., at 44–45.)

**48.** *See, e.g.,* Miller Aff. ¶ 14 ("Based on my years of experience as an investigative journalist, I firmly believe that allowing the government to obtain the identity of reporters' sources by issuing subpoenas to the reporters'

**510**

## 2. The Government Has Not Made The Requisite Showing Necessary To Overcome The Qualified Reporter's Privilege

 As provided above, The Times has a qualified First Amendment and a qualified common-law privilege [49] to protect the confidentiality of the sources of its reporters as revealed in the telephone records sought by the government. The application of this privilege (*i.e.*, the weight to be afforded to the interests militating for and against compelled disclosure) depends on the legal context in which the disclosure is sought. *See Gonzales*, 194 F.3d at 34 n. 3. In the present context, where the identities of the reporters' confidential sources are sought pursuant to a grand jury investigation, the interests militating in favor of disclosure are substantial.

But even in this context, in order to overcome the qualified reporter's privilege, the government must first demonstrate that the *Petroleum Products* test has been satisfied. That is, the government must "make a clear and specific showing that the subpoenaed documents are '[1] highly material and relevant, [2] necessary or critical to the maintenance of the claim, and [3] not obtainable from other available sources.' " *Burke*, 700 F.2d at 77 (quoting *In re Petroleum Products*, 680 F.2d at 7).[50] The government has failed to make this threshold showing.

The government argues that Rule 6(e), Fed.R.Crim.P., prevents it from proffering evidence to this Court to demonstrate that it has satisfied the *Petroleum Products* test.[51] As discussed in greater detail above, Rule 6(e) authorizes the court in the

telephone companies, . . . would seriously impede the ability of all reporters to gather and report the news."); Shenon Aff. ¶ 12 ("Based on my extensive experience as an investigative journalist, I strongly believe that allowing the government to obtain the identity of my sources would greatly hinder my ability to gather and report news in the future, as well as that of all reporters."); Armstrong Aff. ¶ 19 ("In my professional opinion, if this court allows prosecutors to view journalists' phone records and identify a large number of confidential sources, it would do catastrophic damage to the quality of information available on national security issues."); Jack Nelson Aff. ¶ 8 ("[I]f the government is successful in its attempt and learns the identities of sources for not only the Global Relief stories but any other stories on which the reporters worked during that time period, it would have a severe chilling effect on sources and not only damage the reporter's ability to do his job, but the ability of all reporters covering government to do their jobs."); Smith Aff. ¶ 7 ("[B]ecause of the vital role the news media plays in a democratic system of government, the government should have to meet a very high burden to justify either compelling members of the news media to disclose their sources or obtaining the identities of those sources through compelled disclosure of third-party records."); Anna Nelson Aff. ¶ 5 ("Requiring journalists to reveal the identities

of their sources, or obtaining the identity of those sources through telephone record subpoenas, would impoverish our knowledge of contemporary history since confidential sources are often the only sources available to the journalist and thus the original source for historians seeking to unravel public policy or foreign policy.").

49. The common law privilege is no less protective than the First Amendment privilege, and the showing necessary to overcome it is no less weighty. *See, e.g., Riley*, 612 F.2d at 716–17.

50. These requirements are reinforced by the DOJ's Guidelines, which state that any subpoena for telephone toll records of members of the news media should be "as narrowly drawn as possible" and only sought if the government first pursues "all reasonable alternative investigation steps." 28 C.F.R. § 50.10.

51. The government has cited *In re Sealed Case*, 250 F.3d 764 (D.C.Cir.2001), for the proposition that the government is absolutely precluded from disclosing matters occurring before the grand jury to this Court. The *Sealed Case* court did not so hold. Rather, the District of Columbia Circuit held that Rule 6(e), Fed.R.Crim.P., barred the govern-

district where the grand jury convened to order disclosure of secret grand jury information "in connection with a judicial proceeding." Fed.R.Crim.P. 6(e)(3)(E)(i). No materials to overcome the privilege have been transferred under seal to this Court. *See* Fed.R.Crim.P. 6(e)(3)(G).

### a. There Has Been No Showing Of The Materiality, Relevance and Necessity of the Subpoenaed Documents

The government has not disputed that the subpoena at issue will capture a substantial number of records of confidential communications that are irrelevant to the investigation at issue in this case. Nor has the government demonstrated that it has complied with the requirement, imposed by the First Amendment and provided for by the Guidelines, that its subpoena be drawn as narrowly as possible. Rather, the government merely asserts that "[i]t is obvious from the nature of the investigation ... and the nature of the information sought," that it has satisfied the three-part *Petroleum Products* test. (Gov. Mem. Supp. Cross–Mot. Summ. J. at 42.) Such conclusory assertions are insufficient to satisfy the first two prongs of the *Petroleum Products* test.

### b. There Has Been No Showing That The Sought Information Is Unavailable From Other Sources

The government has not sought to demonstrate that it has exhausted all reasonable alternative sources of the identities of government officials who made the alleged unauthorized disclosures to Miller and Shenon. Nor has the government stated

whether it has interviewed all government employees with access to the "leaked" information, whether it has examined the telephone records of all such employees, or what other steps it has taken that would avoid the need to engage in the contemplated invasion into the protected relationship between reporter and confidential source. The only evidence submitted by the government in this regard is the statement of Fitzgerald that the government "reasonably exhausted alternative investigative means." (Fitzgerald Aff. ¶ 8.) This conclusory statement lacks sufficient specificity and clarity to satisfy *Petroleum Products* and *Burke.*

Similarly conclusory assertions concerning the exhaustion of other available sources were rejected by the *In re Williams* court. *See In re Williams,* 766 F.Supp. at 369 (involving an investigation into the identity of the person who improperly leaked an FBI report to the news media). There the Court rejected the government's claim that "there are no reasonable alternative avenues of investigation" finding that "not only is the Government's effort to obtain the information from other sources feasible, but it is also necessary." *Id.*

The *Petroleum Products* court emphasized the significant lengths that a party seeking disclosure of a reporter's confidential sources must go to demonstrate that it has exhausted all other available investigative means. *See, e.g., In re Petroleum Products,* 680 F.2d at 9 (holding that mere fact that 100 witnesses had been deposed was not sufficient to establish that available sources had been exhausted). As the Second Circuit explained:

---

ment from disclosing secret grand jury matters without prior court authorization. *See In re Sealed Case,* 250 F.3d at 770. The *Sealed Case* court observed that the "proper course" would have been for the government simply to have petitioned the court supervising the grand jury. *Id.; see also In re Grand Jury*

*Proceedings (Miller Brewing Co.),* 687 F.2d 1079, 1098 (7th Cir.1982) (affirming district court's decision to grant government's request to disclose certain grand jury materials in connection with a judicial proceeding pursuant to former Rule 6(e)(3)(C)(i), now found at Fed.R.Crim.P. 6(e)(3)(E)(i)).

Justice Brennan has suggested that the harm caused by requiring the taking of 65 depositions did not "outweigh the unpalatable choice that civil contempt would impose upon the" reporter ordered to disclose the names of his confidential source. *In re Roche*, [448 U.S. 1312, 1316, 101 S.Ct. 4, 65 L.Ed.2d 1103] (1980) (Brennan, J. in chambers). Likewise, the District of Columbia Circuit recently recognized that "an alternative requiring the taking of as many as 60 depositions might be a reasonable prerequisite to compelled disclosure." *Zerilli v. Smith*, 656 F.2d 705, 714 (D.C.Cir. 1981).

*Id.* at 9 n. 12. The government has not satisfied this heavy burden.

Finally, it should be noted that the government has tacitly acknowledged that it possesses the wherewithal to search its own internal records for the identities of the suspected leakers:

> If the investigation identified telephone calls from a government agency telephone extension to the *New York Times* reporter, the Government could question the official(s) who placed the telephone call(s). The *New York Times* could not quarrel with the government's ability to examine its own telephone records.

(Fitzgerald Aff. ¶ 10.)

Based on the foregoing, the government has failed to satisfy the third prong of the *Petroleum Products* test. Since the government has failed to carry its burden with respect to the three prongs of the *Petroleum Products* test, it has established no basis for overcoming The Times' qualified reporter's privilege.

### 3. Other Factors Militate Against Invasion of The Times' Qualified Reporter's Privilege

The government's failure to demonstrate compliance with the Guidelines also weighs against disclosure of the sought records. *See* 28 C.F.R. § 50.10(g)(1). Specifically, the government has declined to make any meaningful showing that (1) the subpoena is as narrowly drawn as possible, (2) that it covers a reasonable period of time, and (3) that the government pursued all reasonable alternative investigation steps prior to issuance of the subpoena. *See id.; see also In re Williams*, 766 F.Supp. at 371 (stating that the government's compliance with the Guidelines is relevant to the question of whether it has established a basis for overcoming a qualified reporter's privilege against compelled disclosure of confidential sources.).

In his concurrence in *In re Grand Jury Subpoena, Judith Miller*, Judge Tatel argues that special considerations must be taken into account when the government seeks to overcome a qualified common law reporter's privilege in connection with the investigation and possible prosecution of a government leak:

> In leak cases ... courts applying the privilege must consider [1] not only the government's need for the information and exhaustion of alternative sources, but also [2] the two competing public interests lying at the heart of the balancing test. Specifically, the court must weigh the public interest in compelling disclosure, measured by the harm the leak caused, against the public interest in newsgathering, measured by the leaked information's value. That framework allows authorities seeking to punish a leak to access key evidence when the leaked information does more harm than good ... while preventing discovery when no public interest supports it....

*In re Grand Jury Subpoena, Judith Miller*, 397 F.3d at 997–98 (Tatel, C.J., concurring in judgment). Although this approach has not been adopted by the

 

Second Circuit, it nonetheless warrants consideration. However, since the government has failed to make the requisite *Petroleum Products* showing, the Court need not reach the difficult question of how to properly balance the legitimate, competing interests of the parties.

To deny the relief sought by The Times under these circumstances, *i.e.*, without any showing on the part of the government that the sought records are necessary, relevant, material and unavailable from other sources, has the potential to significantly affect the reporting of news based upon information provided by confidential sources. The record before this Court has demonstrated that the reporters at issue relied upon the promise of confidentiality to gather information concerning issues of paramount national importance—*e.g.*, the nation's preparedness for the attacks of September 11, the government's efforts to combat Al Qaeda post-September 11, and the risk posed to the American people by biological weapons. The government has failed to demonstrate that the balance of the competing interests weighs in its favor.

Accordingly, The Times' motion for summary judgment as to Counts II and III is granted and the government's cross-motion for summary judgment on those same counts is denied.

*Conclusion*

The Court has balanced the interests of the free press and the government under these facts and authorities. That balance requires maintaining the secrecy of the confidential sources of Miller and Shenon.

Accordingly, on the facts and conclusions set forth above, the motion of the government to dismiss the complaint of The Times is denied. The government's cross-motion for summary judgment is granted with respect to Count IV of The Times' complaint, and is otherwise denied. The Times' motion for summary judgment is granted as to Counts II and III of the complaint, and is otherwise denied.

It is so ordered.